[No. 4918.]

THE CITY AND COUNTY OF DENVER ET AL. V.
HALLETT, EXECUTOR.

1. **Cities and Towns—Bonds—Elections.**

Where the question submitted to and voted upon by the electors of a city was, Shall the city issue bonds maturing in not less than fifteen nor more than thirty years, payable in equal annual installments? an ordinance authorizing the issuance of bonds payable at the option of the city fifteen years after date and absolutely due and payable twenty-five years after date was not responsive to the question submitted to the electors and the bonds therein authorized were invalid.

2. **Cities and Towns—Bonds—Auditorium.**

It is within the power of the city and county of Denver to provide by charter for the erection of an auditorium, to purchase a site therefor and to issue bonds to discharge the indebtedness.

3. **Cities and Towns—Bonds—Maturity.**

City bonds maturing fifteen years after date and providing for the payment of one-fifteenth of the principal of the bond each year, or bonds maturing each year through the period of fifteen years so that one-fifteenth of the entire debt will be extinguished each year, are responsive to the question submitted to and voted by the electors of the city—Shall the city issue bonds maturing in not less than fifteen nor more than thirty years payable in equal annual installments?—and are not in conflict with section 8, article XI, of the constitution.

*Appeal from the District Court of the City and County of Denver: Hon. Booth M. Malone, Judge.*

Mr. H. A. LINDSLEY and Mr. H. L. RITTER, for appellants.

Messrs. McBETH & MAY, for appellee.

Mr. JUSTICE STEELE delivered the opinion of the court.

The plaintiff alleges that there was submitted to the taxpaying voters of the city and county of Denver the following question: "Shall the city and county of Denver issue bonds to an amount not exceeding four hundred thousand dollars, bearing interest at a rate of four per cent per annum and maturing in not less than fifteen years nor more than thirty years, the principal to be payable in equal annual installments commencing the next year following the issuance of said bonds, for the purpose of erecting a public auditorium, including the purchase of a site therefor, if desired?" That subsequently to the submission of said question the city council of the city and county of Denver passed an ordinance providing for the issuance of four hundred thousand dollars in bonds for the purpose of erecting a public auditorium, including the purchase of a site therefor.

Section 4 of the ordinance provides that the bonds "shall be payable at the option of the city and county fifteen years after date, and absolutely due and payable twenty-five years after date. They shall be of the denomination of one thousand dollars and shall bear interest at the rate of four per centum per annum, payable semiannually." The complaint further alleges that the city and county of Denver has no power or authority to construct or have an auditorium, nor to issue bonds for the payment of the

cost thereof, and that the officers of the city and county are about to issue bonds in accordance with the terms of said ordinance, and prays that an injunction issue restraining the city and county and the officers thereof from issuing or signing the bonds proposed to be issued, or from entering into any contract for the sale thereof, from acquiring a site for the erection of said auditorium or taking any steps relating thereto. It appears that the plaintiff, in his capacity as executor, is the owner of large tracts of real estate in the city upon which large taxes are annually paid, which will be subjected to very heavy additional burdens for the payment of the principal and interest of the bonds if issued. The complaint does not state the result of the vote on the question submitted, but from the fact that the case is here, we conclude that the vote was in the affirmative.

Demurrer to the complaint was overruled. The defendants elected to stand by the demurrer; judgment was rendered in accordance with the prayer of the complaint, and the defendants appealed to this court.

The judgment of the district court was right. The power to direct the issuance of bonds for the erection of an auditorium was granted by the people when they voted affirmatively upon the question submitted; but the people granted the power to issue bonds "bearing interest at the rate of four per cent per annum, maturing in not less than fifteen nor more than thirty years, the *principal* to be payable in equal annual installments commencing the next year following the issuance of said bonds," not bonds "payable at the option of the city and county fifteen years after date, and absolutely due and payable twenty-five years after date." The people vested in the city council the discretion of determining when, after fifteen years and within thirty years from their date,

all the bonds should mature, but they required that the principal should be made payable in equal annual installments. The bonds authorized by the ordinance are not the bonds authorized by the people; and it follows that the issuance of the bonds under the ordinance was properly enjoined.

The city attorney urges that bonds providing for the payment of the principal in equal annual installments are unsalable, and that the will of the people in voting for an auditorium will be overthrown unless bonds such as proposed are held to be in accordance with the question submitted. The city council derives all its powers to issue bonds for an auditorium from the people. The plain, unambiguous mandate was that the bonds when issued should be payable in equal annual installments. If the bonds then authorized cannot be sold, we know of no authority that can direct the issuance of another and different character of bond.

It is also said that the charter requires a sinking fund to meet the bonded indebtedness, and that the annual deposit in that fund is the equivalent of payment; and that the bonds are made "payable in equal annual installments," when annual deposits in the sinking fund are made. The word "payable," in this connection, is not susceptible of any such construction. "Payable in equal annual installments" means that an equal amount of each bond or of the whole debt shall become due each year; that the payment thereof shall become legally enforcible against the city; that it is the right of the city to make annual payments of the principal, and the duty of the holders of the bonds to accept such payment. The words are in daily use by the English-speaking people and need no interpretation, and to construe them as meaning that the city may place annually in its sinking

fund an amount to meet the obligations at maturity would be without justification.

In holding, as we do, that the bonds proposed are not the bonds directed by the people to be issued, we have determined the case, and might well refuse to decide the other questions involved. But in as much as the power of the city to erect a public auditorium is challenged and the question is of public moment and concern, and as much time and expense will be saved by a determination of this, the main question, we are constrained by the force of the public interests to give our opinion upon this subject.

This court, in passing upon the authority of the city of Leadville to license certain occupations, said, page 520 of 14th Colorado: "It is a well settled elementary principle that the charter of a municipal corporation, or, if organized under a general law, that such general law is the instrumentality by means of which the legislature of the state delegates to the municipal body the right to exercise such franchise, and such legislative power and authority as may be essential to the safety, well-being and prosperity of the community. It is equally well settled that the charter or the law by which the municipal body is created is to be strictly construed and that no powers are to be exercised except those which are expressly conferred or which exist by necessary implication. This principle of law is expressed with extraordinary clearness in 1 Dil. Mun. Corp. 389: 'It is a general and understood proposition of law that a municipal corporation possesses and can exercise the following powers and no others: First, those granted in express words; second, those necessarily or fairly implied in, or incident to, the powers expressly granted; third, those essential to the declared objects and purposes of the corporation—not simply convenient, but indispensable. Any fair, reasonable

doubt concerning the existence of power is resolved by the court against the corporation, and the power is denied. Of every municipal corporation the charter or statute by which it is created is its organic act. Neither the corporation nor its officers can do any act or make any contract or incur any liability not authorized thereby. All acts beyond the scope of the powers granted are void.' '' And upon the authority of this case counsel contend that the municipality known as the city and county of Denver has no power to build an auditorium, because power to do so is not conferred by the twentieth article of the constitution; because power to do so is not incident to nor can it be fairly implied from the powers expressly conferred; because an auditorium is not essential to the declared objects and purposes of the municipality. We agree with counsel that no power to build an auditorium is expressly granted by the twentieth article; that such power is not incident to the powers expressly conferred, nor can it be necessarily or fairly implied therefrom; and that an auditorium is not indispensable to the objects and purposes of the municipality as declared in the twentieth article. But we do not agree with him that the stinted grant of power contained in section 1 and other parts of the article is the only power possessed by Denver. It seems very clear that the statement contained in the first section was not intended to be an enumeration of powers conferred, but simply the expression of a few of the more prominent powers which municipal corporations are frequently granted. The purpose of the twentieth article was to grant home rule to Denver and the other municipalities of the state, and it was intended to enlarge the powers beyond those usually granted by the legislature; and so it was declared in the article that until the adoption of a new charter by the people that the charter as it then

existed should be the charter of the municipality, and further that the people of Denver shall always have the exclusive power of making, altering, revising or amending their charter; and further that the charter, when adopted by the people, should be the organic law of the municipality and should supersede all other charters. It was intended to confer not only the powers specially mentioned, but to bestow upon the people of Denver every power possessed by the legislature in the making of a charter for Denver.

It is therefore necessary to determine whether the legislature could have conferred upon the city of Denver power to purchase a site, erect an auditorium thereon, and issue bonds to discharge the indebtedness. In a number of cases before this court as well as the court of appeals it has been held that with respect to municipal corporations, except as limited by the constitution, the general assembly has plenary power; that it is clearly a legislative function to determine what power shall be granted, what withheld, and what restrictions shall be imposed in the exercise of the powers granted.—*Dietz v. City of Central,* 1 Colo. 323; *Darrow v. People,* 8 Colo. 426; *People ex rel. v. Hall,* 8 Colo. 485; *Valverde v. Shattuck,* 19 Colo. 104; *Trimble v. People,* 19 Colo. 187; *City of Denver v. Coulehan,* 20 Colo. 471; *Johnson v. People,* 6 Colo. App. 163; Dillon's Municipal Corporations, 44.

The supremacy of the legislative authority over municipal corporations is not, however, in all respects unlimited, but the limitation must be sought in the national or state constitution.—Dillon's Mun. Corp., § 9.

The same author, at page 79, says: "Permitting the voters of a municipality to decide upon questions of local interest or expediency, such as those mentioned in this section and in the notes, seems to the

author to be conformable to those ideas of self government and self regulation by the people concerned which lie at the basis not only of our municipalities but of our institutions.''

The general purpose of all municipal corporations is to promote the general welfare and happiness of the people; and provisions are generally made for the suppression of vice and immorality, and the advancement of public health and good order, and the promotion of trade and industry. For many years Denver has had power under her charter to appropriate funds for the entertainment of visitors and for the expenses of funerals, power to take an enumeration of the inhabitants, to foster and encourage manufactories, for laying out and ornamenting grounds for a cemetery and for the sale of lots therein, and to support or own a public library. Not one of these powers can be regarded as indispensable to a municipality. Municipalities are permitted to exercise them because they tend to the advancement, the culture, the convenience and the general welfare of the public. It is not a valid objection to the exercise of such powers that one class of the inhabitants would receive more benefit than another. The test is whether the power, if exercised, will promote the general objects and purposes of the municipality, and of this the legislature is the judge in the first instance; and unless it clearly appears that some constitutional provision has been infringed, the law must be upheld.

An act of the legislature of the state of New York authorizing the cities of New York and Brooklyn to build a bridge connecting the two cities was upheld by the court of appeals. The act, it was urged, was in conflict with the constitution of the state, which ordains that no city '' * * * shall be allowed to incur any indebtedness except for * * *

city purposes." In passing upon the validity of the act, the court said: "It is impossible to define in a general way with entire accuracy what a city purpose is, within the meaning of the constitution. Each case must largely depend upon its own facts, and the meaning of these words must be evolved by a process of exclusion and inclusion in judicial construction. * * * The legislature when legislating in view of this constitutional limitation must determine in the first instance what is a municipal purpose. * * * When its act is challenged as in conflict with the constitutional limitation the courts must determine whether debt is authorized to be incurred for a purpose not municipal. But as the dividing line between what is a municipal purpose and what is not is in many cases shadowy and uncertain, great weight should be given by the courts to the legislative determination, and its action should not be annulled unless the purpose appears clearly to be one not authorized. As said by Judge Folger in *Weisner v. Village of Douglas,* 64 N. Y. 91, 'If the purpose designed by the legislature lies so near the border line that it may be doubtful on which side of it it is domiciled, the courts may not set their judgment against that of the lawmakers.' "—*People v. Murphy,* 76 N. Y. 475.

In Cooley on Taxation, at page 185, it is said: "Public and private interests are so commingled in many cases that it is difficult to determine which predominates; and the question whether the public interest is so distinct and clear as to justify taxation is often embarrassing to the legislature, and not less so to the judiciary. All attempts to lay down general rules whereby the difficulties may be solved have seemed, when new and peculiar cases arose, only to add to the embarrassment instead of furnishing the means of extrication from it." After quoting from several cases which we shall presently cite, he further

says: "These are very strong and sweeping asser-
tions, but they are supported by many others equally
emphatic and comprehensive, which are to be met
with in the adjudications of courts. The very empha-
sis, however, with which the principle is declared
renders it peculiarly liable to mislead unless it is
examined in the light of the adjudicated cases in
which it has been applied, generally with explana-
tions, and often with necessary qualifications."

In sustaining an act of the legislature authoriz-
ing the city of Cincinnati to construct the Cincinnati
Southern Railroad, a road several hundred miles in
length, having Cincinnati and Chattanooga its north-
ern and southern termini respectively, Chief Justice
Scott, in *Walker v. Cincinnati*, 21 Ohio State 14, said:
"Courts cannot, in our judgment, nullify an act of
legislation on the vague ground that they think it
opposed to a general 'latent spirit' supposed to per-
vade the constitution, but which neither its terms nor
its implications clearly disclose in any of its parts.
To do so would be to arrogate the power of making
the constitution what the court may think it ought to
be, instead of simply declaring what it is. The exer-
cise of such power would make the court sovereign
over both constitution and people, and convert the
government into a judicial despotism. Whilst we
declare that legislative power can only be exercised
within the limits prescribed by the constitution, we
are equally bound to keep within the sphere allotted
to us by the same instrument." And in speaking of
the power of the legislature said: "But we must
bear in mind that the question is one of legislative
power, and not of the wisdom or even justice of the
manner in which that power, if it exists, has been
exercised. Had we the jurisdiction to pass upon the
latter question, we should probably have no hesita-
tion in declaring the act under review to be an abuse

of the taxing power." And recognizing that legislation authorizing municipal aid to railroads was unwise, said: "Were the question a new one, and properly determinable by the judgment of a court, we should perhaps concur in opinion with Judge Redfield, that subscriptions for railway stock by cities and towns do not come appropriately within the range of municipal powers and duties. Yet he is constrained to add that 'the weight of authority is all in one direction, and it is now too late to bring the matter into serious debate.' " The chief justice then says: "And upon the question of fact whether a particular road is thus essential to the interests of the city, this court in the case of the C. W. & Z. R. R., already referred to, quote approvingly from the case of *Goodwin v. Crump,* 8 Leigh R. 120, in which it was said: 'If then the test of the corporate character of the act is the probable benefit of it to the community within the corporation, who is the proper judge whether a proposed measure is likely to conduce to the public interests of the city? Is it the court, whose avocations little fit it for such inquiries; or is it the mass of the people themselves—the majority of the corporation, acting (as they must do if they act at all) under the sanction of the legislative body? The latter assuredly.' "

It is held in Illinois that a public purpose is a corporate purpose, and that a tax imposed for a corporate purpose is one to be expended in a manner which shall promote the general prosperity and welfare of the municipality which levies it.—*Johnson v. County of Stark,* 24 Ill. 75; *Taylor v. Thompson,* 42 Ill. 9; *C. D. & V. R. R. Co. v. Smith,* 62 Ill. 268; *Burr et al. v. City of Carbondale,* 76 Ill. 455; *Q. M. & P. R. R. Co. v. Morris,* 84 Ill. 411.

Judge Dixon, in 19 Wisconsin 686, says: "The legislature cannot create a public debt or levy a tax

or authorize a municipal corporation to do so in order to raise funds for a mere private purpose. It cannot in the form of a tax take the money of the citizens and give it to an individual, the public interest or welfare being in no way connected with the transaction. The objects for which money is raised by taxation must be public, and such as subserve the common interest and well-being of the community required to contribute. To justify the court in arresting the proceedings and declaring the tax void the absence of all possible public interest in the purposes for which the funds are raised must be clear and palpable—so clear and palpable as to be perceptible by every mind at first blush. In addition to these, I understand that it is not denied that claims founded in equity and justice in the largest sense of those terms, or in gratitude or charity, will support a tax. Such is the language of the authorities.'' And in 25 Wisconsin, at page 186, speaking of municipal aid to railroads, he says: ''The principle upon which taxation has been sustained will readily appear by a reference to the opinion in *Curtis v. Whipple.* The city, town or county becomes a part owner of the road to the extent of the stock taken, and the work being one which the public might have engaged in as the sole owner, and paid for entirely out of public funds, it has been considered that there was no valid objection to its becoming a part owner thereof as a stockholder in a private corporation which has undertaken to do the same work. To the extent of the stock taken the city, town or county is directly interested and benefited by the money expended in the work, the same being a matter of public concern, and it is, in our judgment, upon this principle, and this alone, that the taxation in that class of cases can be sustained. In saying this we of course do not intend to exclude the idea, found in all the cases, that the road

must be one situated within or passing through the corporate limits of the municipality to be taxed, and so promoting the general prosperity and welfare of the people who pay the taxes.''

The legislature of New York conferred upon the city of Brooklyn the power to establish and maintain public baths, and the city was held liable for the use of a private pier at which place a public bath had been established.—*Poillon v. Brooklyn*, 101 N. Y. 132.

The legislature of Nebraska authorized counties to participate in interstate expositions, to issue bonds for such purpose and to erect and maintain suitable buildings with which to make a county exhibit. The act was upheld and the bonds declared to be for a public purpose.—*State v. Cornell*, 53 Neb. 556. The opinion cites many cases upholding the validity of laws appropriating money for state and municipal exhibits at expositions, from Pennsylvania, California, Kentucky and Tennessee. The citation from the case *Shelby County v. Exposition Co.*, 96 Tenn. 653, is as follows: ''To our minds it is entirely clear that an exhibition of the resources of Shelby county at the approaching State Centennial Exposition is a county purpose. In view of the fact that the event to be celebrated is one of no less note and importance than the birth of a great state into the American Union, and of the further fact that the exposition is reasonably expected to attract great and favorable attention throughout the country, and be participated in and largely attended by intelligent and enterprising citizens of numerous other states at least, it is beyond plausible debate that such an exhibition is well calculated to advance the material interests and promote the general welfare of the people of the county making it. It will excite industry, thrift, development and worthy emulation in different avenues of commerce, agriculture, manufacture, art and

education within the county, thereby tending to the permanent betterment and prosperity of her whole people. In short, it will encourage progress, and progress will insure increased intelligence, wealth and happiness for her people, individually and collectively. Undeniably that which promotes such an object and facilitates such a result in any county is, to that county, a county purpose in the truest sense."

In the case *Sun Printing Company v. New York,* 152 N. Y. 257, in which was involved the power of the legislature to invest the city of New York with authority to build a railroad within the limits of the city and issue bonds to meet the indebtedness, the court said, with reference to a city purpose: "We are aware that the expenditures of our city governments have become enormous, and that appropriations have been made for a great variety of purposes, many of which may be open to criticism and that a complete definition of a 'city purpose' may not be possible, in view of the fact that many reasons may arise which we are unable to foresee or now consider. The authorities, in so far as they have spoken upon the subject, have only attempted a definition as to certain specified purposes. We shall not now attempt a definition, except in general terms, further than is necessary to determine the meaning of the acts which we have under review. Generally, we think, the purpose must be necessary for the common good and general welfare of the people of the municipality, sanctioned by its citizens, public in character, and authorized by the legislature."

In Massachusetts, towns have power to raise money by taxation for celebrations (*Hill v. East Hampton,* 140 Mass. 381); and may appropriate money for public concerts by a band (*Hubbard v. Taunton,* 140 Mass. 467).

The erection of a memorial hall to be used and maintained as a memorial hall to the soldiers and sailors of the War of the Rebellion may properly be deemed a public purpose, for which the legislature may authorize the raising of money by taxation.— *Kingman v. Brockton*, 11 L. R. A. 123. It was said by the writer of the opinion in this case: "This may properly be deemed to be a public purpose, and a statute authorizing the raising of money by taxation for the erection of such a memorial hall may be vindicated on the same grounds as statutes authorizing the raising of money for monuments, statues, gates or archways, celebrations, the publication of town histories, parks, roads, roads leading to points of fine natural scenery, decorations upon public buildings, or other public ornaments or embellishments, designed merely to promote the general welfare by providing for fresh air or recreation or by educating the public tastes or by inspiring sentiments of patriotism or of respect for the memory of worthy individuals. The reasonable use of public money for such purposes has been sanctioned by several different statutes, and the constitutional right of the legislature to pass such statutes rests on sound principles."

It is within the power of the officers of a school district in Vermont to build a hall in connection with a schoolhouse, designed to accommodate the schools and the inhabitants of the district, for the purpose of examinations and exhibitions and such other things as are proper and customary in connection with district schools.—*Greenbanks v. Boutwell*, 43 Vt. 207.

The town organizations, particularly in the New England states, do not act through representative bodies, but the few corporate powers they possess are exercised by the citizens through town meetings; yet the authority of these towns to build town halls

is recognized, and the town is held to have discretionary powers and that it may anticipate its wants and may rent a portion of the town building not in use.

A Vermont town had built a two-story building for town purposes; the upper story was known as the opera hall, which was fitted up for the accommodation of theatrical troupes. The court held the building of the town hall was a valid exercise of power, and that as the primary object of the building was for municipal purposes, the fact that the building was incidentally used for theatrical purposes did not have the effect of rendering the action invalid.—*Bates v. Bassett,* 60 Vt. 530.

It was held in Tennessee, where the constitution authorizes municipal corporations to appropriate money for corporate purposes, that the city of Knoxville could legally appropriate money in aid of a college located without the city limits.—*East Tennessee University v. Knoxville,* 65 Tenn. 166.

It is held that Philadelphia has power to entertain distinguished visitors at public expense. —*Tathan v. Philadelphia,* 11 Phila. 276.

The Century Dictionary defines *auditorium* as "A hall of audience. In a church, theater, public hall, or the like, the space allotted to the hearers or audience." If the primary object of a building is to provide a place for public meetings, the building itself may properly be designated an auditorium, although other portions of it are devoted to other uses than that of an auditorium in the strict sense of that term, and this is what the framers of the charter had in mind when the question submitted was proposed.

It is said that one of the principal purposes for which the proposed building is to be used is that of providing a place of meeting for the national conventions of the various organizations throughout the

country; that even though it should appear that in other cities there are commodious places for the meeting of such national conventions and that Denver has been highly favored by these bodies, but that unless suitable accommodations are provided the organizations will not select Denver as a place of meeting, still that the erection of a building such as is proposed, to meet the competition of other cities, cannot be regarded as a proper exercise of municipal power, and that a building so used would be for a private and not a public use, and that the benefits accruing therefrom, if any, would be private and not public. We are not prepared to say that the erection of a building for the sole purpose suggested would not be within municipal authority, nor that the benefits accruing therefrom would not be public. It is not a valid objection to the exercise of municipal power that the public will not make exclusive use of the building. Judge Cooley, in his work on Taxation, at page 223, says: "The purposes to be accomplished by taxation need not be exclusively public in order to warrant an exercise of the power. There are sometimes cases in which the public have equally with private parties an interest, and in which therefore an apportionment of the burden between the public and such individuals might be appropriate. In such cases public interest may properly invoke legislative action for the levy of a tax; and the legislative determination as to the just proportion to be borne by the public must be conclusive, so far at least as the public are concerned."

It will not be disputed that the public buildings in Denver are not now suited to the demands of the public. They are poorly ventilated, and crowded, and a wise and economical administration of public affairs will require that an auditorium, if erected, be so constructed as to provide accommodations for

a portion of the public officers and public records. Moreover, as the power is now vested exclusively in the people themselves of making, revising, altering or amending their charter, and as they have the power to petition for any measure or charter amendment or for a charter convention, and may have referred to them, upon petition, any ordinance passed by the council, or may have by petition ordinances submitted to the qualified electors, and as other matters must be submitted to them, it would seem to be within their power to provide a place where matters of municipal policy and expediency may be proposed, considered and acted upon. We have cited authorities holding that school districts have authority to provide a public place designed to accommodate the schools and the inhabitants of the district, for the purpose of examinations and exhibitions, or such other things as are proper and customary in connection with district schools. Without considering the question as to what power should provide the place, the power exists; and it would seem to be entirely proper for the city to own a place where the public can witness the exercises of commencement day of the various high schools of the city. Such a place does not now exist in Denver, and never has existed. At no time in the history of Denver have one-half of the persons desiring to do so been able to witness the commencement exercises of our high schools, and no good reason is apparent why the city should not provide a suitable place for the accommodation of the public.

If Cincinnati may build a railroad connecting it with a city in another state; if Philadelphia may appropriate public money for the entertainment of visitors; if Brooklyn may enjoy a public bath; if New York may build a bridge over water not owned by it, to connect it with another city; if Knoxville may

appropriate money to aid a college located outside its limits; if the municipalities of Nebraska, Tennessee and Pennsylvania may appropriate money to exhibit their resources; if towns in Massachusetts may erect memorial halls, if Vermont towns may build halls for school exhibitions; if New England towns may build town halls for the accommodation of their citizens, under constitutional provisions limiting the power of levying taxes to "city purposes," to "county purposes," to "public purposes," or to "corporate purposes," as the case may be, there is no apparent reason why the taxpayers of Denver may not, under a constitutional provision limiting the power to assess and collect taxes to the "purposes of such corporation," by vote order the erection of an auditorium for public purposes, even though it be incidentally used for conventions and national associations.

As power to erect an auditorium is not granted by the twentieth article, the provisions of that article relating to the issuance of bonds to carry out the powers and purposes enumerated in section 1 of the article, however they may be construed, have no application to the case at bar. Bonds for the building of an auditorium must be issued under the limitations of section 8 of article XI of the constitution, and the question, if again submitted, should be drawn with reference to that article and section.

Our conclusions, therefore, are:

1. That the bonds proposed are not responsive to the question submitted.

2. That the question submitted not being in compliance with section 8 of article XI of the constitution, the bonds proposed would be illegal, and therefore nothing can be done under the present charter provision.

3. That it is within the power of the city and county of Denver to provide by charter for the erection of an auditorium and to purchase a site therefor.

The judgment of the district court is affirmed.

Decision by the court *en banc*.

In arriving at the conclusion that the judgment of the district court should be affirmed the justices all agree.

From that portion of the opinion which holds that the people of the city and county of Denver have the power to direct the erection of a public auditorium at public expense, to purchase a site therefor, and to direct the issuance of bonds to pay for the same, Chief Justice Gabbert, Mr. Justice Campbell and Mr. Justice Maxwell dissent, it being their opinion that the purpose mentioned is not a "corporate purpose."

*On Rehearing.*

Mr. JUSTICE STEELE delivered the opinion of the court.

In behalf of the city and county of Denver, we are urged to modify the opinion and to hold that the city and county may issue bonds under the question submitted, so that the entire debt will be extinguished at the expiration of fifteen years. Counsel stated in submitting the case that bonds which provided for an annual payment of the principal, or bonds maturing annually through the period of fifteen years, were unsalable; and that unless depositing the required amount annually in a sinking fund could be regarded as a payment, the charter must be amended. Because of these statements we gave to the question now presented no serious consideration. We have held that article XX does not expressly confer power upon the municipality to erect an auditorium, and as that article does not purport to amend section 8 of article

XI with respect to bonds for the purpose of erecting an auditorium, bonds issued for such purpose must be issued under the limitation of that section.

Section 8 provides: ''No city   *   *   *   shall contract any debt by loan in any form, except by means of an ordinance   *   *   *   specifying the purposes to which the funds to be raised shall be applied, and providing for the levy of a tax   *   *   *   sufficient to pay the annual interest and extinguish the principal of such debt within fifteen but not less than ten years from the creation thereof.'' The question submitted to the electors was: ''Shall the city and county of Denver issue bonds   *   *   *   bearing interest at the rate of four per cent per annum, and maturing in not less than fifteen years nor more than thirty years, the principal to be payable in equal annual installments?'' We are asked to determine whether, in view of the limitation of section 8 of article XI, and under the question thus submitted, the city and county may issue bonds maturing in fifteen years. If the question submitted had been, ''Shall the city and county issue bonds maturing in ten years?'' or had been ''Shall the city and county issue bonds maturing in fifteen years?'' an affirmative vote upon either question would have authorized the issuance of bonds and have met the requirements of the constitution. And we are satisfied that although the people, in directing the issuance of bonds maturing in not less than fifteen nor more than thirty years, exceeded the authority conferred upon them through the constitution, they did thereby confer power upon the council to issue bonds maturing in fifteen years; and that if the council shall direct the issuance of bonds providing for the annual installments of principal so that the entire debt will be extinguished at the expiration of fifteen years, the bonds will conform to the question submitted and will

meet the requirements of section 8 of article XI of the constitution. The mandate of section 8 that the ordinance shall provide for the levy of a tax sufficient to extinguish the principal of such debt within fifteen but not less than ten years does not mean that no part of the principal of the debt shall be paid within ten years, but does mean that provision shall be made by the levy of a tax for the extinguishment of the entire debt within not less than ten nor more than fifteen years. We see no legal objection to the municipality providing for annual payments of the principal. It is a more economical manner of discharging the debt than that of making annual deposits in a sinking fund, and decidedly safer, for even sinking funds have been known to take unto themselves wings; and these considerations, perhaps, induced the framers of the constitution to not prohibit the payment of the public indebtedness in installments. We therefore decide that the council may provide for bonds maturing annually during the period so that one-fifteenth of the whole debt will mature each year. We find support for our decision that the words ''not more than thirty years,'' in the question submitted to the electors, should be regarded as surplusage, and that they do not invalidate the whole submission, in an opinion by Mr. Justice Brewer, when a member of the supreme court of the state of Kansas, in the case of *Turner v. Commissioners of Woodson County,* 27 Kan. 314. The people of one of the townships in Woodson county, Kansas, voted bonds in an amount exceeding that authorized by statute. The bonds were held valid to the amount authorized by statute. In the course of the opinion it was said: ''However excessive the authority apparently granted by the vote to the commissioners, that authority is good up to the statutory limit. The vote of the township was simply an authorization by a principal to its

agent, and the agent may perform the act authorized, except so far as it is restrained by some provision of law. Generally speaking, a grant of excessive authority is good up to the legal limit, and an authorization to do more than can legally be done is void only as to the excess.'' One of the sections of the act under which the bonds were voted was unconstitutional, and counsel contended that as the section was written in the act, it must be presumed to have been considered by the voters and to have influenced their votes. Answering this point, Judge Brewer said:

''The idea of counsel seems to be that in this section 10 there is presented an extra inducement to the voters of the township to incur this indebtedness; that but for such inducement the bonds would not have been voted, and as the inducement fails, the vote must also fail. Yet as all persons are presumed to know the law, the presumption of course is that the voters all knew that this section is unconstitutional, and were therefore uninfluenced in their action by this apparent inducement.''

The objection here is that the people cannot be said to have understood that the minimum limit of time was in fact the maximum, nor can it be told how they would have voted if the question had been put and had been ordered to be put in this restricted form. The objection is, we think, disposed of by the decision of the case we have cited.

It is suggested that this opinion is contrary to that in the case *City v. Hayes,* 28 Colo. 110, but we do not so regard it. In the Hayes case the court held invalid the proceedings of the city council in submitting to the electors of the city of Denver the proposition of creating a debt for eleven distinct purposes, without giving to the voter an opportunity to express his will as to any one of them.

Our conclusions therefore are:

1.   That the bonds proposed are not responsive to the question submitted.

2.   That it is within the power of the city and county of Denver to provide by charter for the erection of an auditorium, to purchase a site therefor, and to issue bonds to discharge the indebtedness.

3.   That bonds maturing in fifteen years after date, providing for the payment of one-fifteenth of the principal of the bond in annual installments, or bonds maturing each year through the period of fifteen years, so that one-fifteenth of the entire debt will be extinguished each year, will be responsive to the question submitted to the people, and will not be in conflict with section 8 of article XI of the constitution, and that when so issued will be valid obligations of the city, authorized by the charter.

That portion of the former opinion stating our conclusions is withdrawn.

Decision by the court *en banc.*

In arriving at the conclusion that the judgment should be affirmed the justices all agree. From that portion of the opinion which holds that the people of the city and county of Denver have the power to direct the erection of a public auditorium at public expense, to purchase a site therefor, and to direct the issuance of bonds to pay for the same, Chief Justice Gabbert, Mr. Justice Campbell and Mr. Justice Maxwell dissent, it being their opinion that the purpose mentioned is not a "corporate purpose."

Chief Justice Gabbert, Mr. Justice Campbell and Mr. Justice Maxwell also dissent from that portion of the opinion which holds that it is not necessary to resubmit the question to the people, and that the city may by ordinance issue bonds under the authority already given.