## STATE INS. CO. V. HORNER.

1. CONTRACTS OF INSURANCE — EQUITABLE RELIEF AGAINST FRAUDU-LENT PRACTICES — CONSTRUCTION OF WORDS AND PHRASES. — Contracts of insurance, like other contracts, are to be interpreted according to the language employed by the parties.

2. But courts of equity will relieve against such contracts where fraud or deception supervenes, and substantial ambiguity therein may be explained as in other cases.

3. The meaning of the phrase "writing the risk," and the items covered by the expression "the expenses of writing the risk," used in a policy of insurance, may be shown by oral evidence; the jury may determine what is meant by and included within each of these expressions; but that body may not pass upon the question whether one embraces the other.

4. While courts have no power to change or modify by construction the expression "the expenses of writing the risk" when thus used, they should require that such expenses be reasonable.

5. Doubtful provisions of insurance policies are to be construed most favorably to the assured.

6. In a provision in a policy that the "insurance may be terminated, at the request of the insured, by repaying the company the customary short rates from the date of this policy, together with the expenses of writing the risk," the "customary short rates" do not include "the expenses of writing the risk."

7. In such a policy "the expenses of writing the risk" includes the commission paid by the company to its agent.

*Error to County Court of Arapahoe County.*

Messrs. W. J. WEEBER and ROGERS & McCORD, for plaintiff in error.

Messrs. JOHN W. HORNER, *pro se*, and P. L. PALMER, for defendant in error.

CHIEF JUSTICE HELM delivered the opinion of the court.

The insurance policy issued by plaintiff in error to defendant in error contained the following provision: "This insurance may be terminated, at the request of the insured, by repaying the company the customary short rates from the date of this policy, together with

the expenses of writing the risk." Upon the construction of this provision rests the present decision.

Contracts of insurance, like other contracts, are to be interpreted according to the language 'employed by the parties. Neither the understanding of the insurer or insured, nor custom or usage inconsistent therewith, can be substituted for the provisions of the written policy. *Grace v. Insurance Co.* 109 U. S. 278; *Sperry v. Insurance Co.* 26 Fed. Rep. 234; May, Ins. § 172; Wood, Ins. § 57. It is hardly necessary to add that courts of equity will relieve against such contracts where fraud or deception supervenes, and that substantial ambiguity therein may be explained as in other cases.

The clause above quoted clearly provided that, upon the termination of the policy within the period named therein, the company should be repaid two specific amounts, viz.: *First,* the "customary short rates" from the date of the contract; and *second,* "the expenses of writing the risk." In this' respect the provision is too plain to admit of serious controversy. If the expression "the customary short rates" includes the "expenses" referred to, why are those expenses mentioned? Reference thereto is wholly superfluous, and can only serve to mislead. The two expressions may each possess a peculiar technical significance, and testimony may be necessary to explain their meaning; but that they refer to different things, and that the former does not include the latter, and was not intended to do so, are propositions placed by the contracting parties themselves outside the province of construction. The jury may determine upon the evidence produced what is meant by and included within each of these expressions, but we do not consent to the idea that the question whether one embraces the other is a proper subject for their consideration. It may be true that the "customary short rate" itself includes the expenses of writing a correspondingly short risk, when such risk is taken in the first instance; but, if the assured

elects to secure the benefit of a long-time and low-rate policy, and agrees that, in case he invokes the privilege of canceling his contract, he will pay, in addition to the customary short rate, the expenses of writing the long risk, we cannot say that his agreement is so unreasonable or unjust as to warrant his release from performance upon exercising the option in question.

We shall assume, therefore, that the assured, upon cancellation of the policy, was to pay the "expenses of writing the risk," in addition to the "customary short rate." What are "the expenses of writing the risk?" What is the meaning of this expression, as it is generally understood among insurance people? Does it include commissions paid to the agent for procuring the risk? An answer to the third and last of the foregoing interrogatories will be decisive of the present controversy, because it embraces the only item of difference between the parties.

It is contended by defendant in error that the phrase "writing the risk" is synonymous in meaning with the phrase "writing the policy;" that the expense of writing a policy is the one-dollar fee paid the agent for his clerical labor in preparing the instrument; and, therefore, that the one-dollar fee constitutes the entire expenses of writing the risk, and the agent's commission is no part thereof.

The fee of $1 for writing the policy is always paid to and retained by the agent. The company never receives it, or has anything whatever to do with it; nor does it in any way appear upon the company's books. It is a small item, hardly deserving this prominence in the contract; and, if considered worthy of such careful mention, it is strange that so much indifference was exhibited in the use of language. Why is the fee of $1 designated "expenses," and why is the word "risk" substituted for the word "policy" The word "expenses" usually indicates more than one expense or item, and no one capa-

ble of contracting would be excused in law for not know-
ing that the word "risk" and the word "policy" possess
a radically different significance. The company itself
could hardly have thought that it was merely providing
for the retention of the one-dollar fee paid for writing
the policy; a fee of which it took no cognizance, and pre-
served no record.

But the meaning generally assigned among insurance
people to the phrase "writing the risk," and the items
covered by the expression "the expenses of writing the
risk," are subjects fairly within the domain of oral ex-
planation. Such explanatory testimony was given at
the trial by witnesses engaged in the insurance business,
and it will now be accepted as controlling. The four in-
surance agents called by the company agree that the two
phrases, "writing the policy" and "writing the risk,"
do not, in insurance parlance, mean the same thing; and
such is the tenor of the same kind of testimony received
on behalf of defendant in error. These witnesses, seven
in all, unite in declaring that the expense of writing the
policy is the fee, usually $1, for the clerical labor of
preparing the contract; but not one of them squarely
and consistently asserts that this is the total expense of
writing the risk. There is considerable difference of
opinion among them as to what items constitute these
expenses, but four of them positively assert, and the re-
mainder fairly admit, that the commission paid by the
company to its agent is included.

Some of these witnesses stated that they were not
familiar with the provision under consideration. It does
not seem to be universally incorporated in insurance
policies, though its presence is not uncommon. This
undoubtedly accounts for some of the discrepancies be-
tween the witnesses, and also for some of the seeming
inconsistencies in the testimony of the same witness.
Upon a retrial of the case most if not all of these discrep-
ancies and inconsistencies will probably disappear; and,

if our conclusion, based upon the testimony now before us, that a repayment to the company of the commission paid its agent was within the purview of the contract, be wrong, such error will doubtless be made to appear.

It may be that, as claimed by defendant in error, the foregoing view will, in individual cases, result in surprise and injury to the assured; but our answer to this assertion, if it rest upon a truthful basis, is, that reasonable examination and inquiry before entering into the contract would avoid such surprise and resulting hardship. Besides, courts have no power, under circumstances like those here presented, to reconstruct contracts solemnly and deliberately made. We do not hesitate, however, to hold that the expenses mentioned in the phrase under discussion must be reasonable. The courts will not permit insurance companies to take advantage of this feature of the contract, and collect unreasonable charges or expenses. But in the case at bar no controversy exists concerning the reasonableness of the commission paid to the agent. Therefore, this particular matter requires no further notice.

We are not unmindful of the rule that doubtful provisions of insurance policies are to be construed most favorably to the assured; but we do not feel at liberty to give this rule a broader application in the present case than is embraced within the foregoing discussion.

The judgment is reversed and the cause remanded for a new trial.

*Reversed.*