No. 20,114.

Four-County Metropolitan Capital Improvement
District, et al. *v.* The Board of County
Commissioners of Adams County, et al.
(369 P. [2d] 67)

Decided February 13, 1962. Rehearing denied March 3, 1962.

Mr. Fred M. Winner, Mr. Pierpont Fuller, Mr. John M. Evans, for Petitioners.

Mr. William Pehr, County Attorney, Mr. Charles Ginsberg, Special Counsel, for Adams County.

Mr. Orrel A. Daniel, City Attorney for Brighton.

Mr. Edward A. Brown, Mr. Leonard H. McCain, for Taxpayers and Old Age Pensioners.

Mr. Bernard V. Berardini, City Attorney for Aurora.

Mr. David J. Hahn, Mr. Bentley M. McMullin, for Intervenors.

*En Banc.*

Mr. Justice Moore delivered the opinion of the Court.

In this proceeding we are required to determine whether the Four-County Metropolitan Capital Improvement District, the creation of which was authorized by S.L. 1961, chapter 179, can constitutionally exercise the powers purportedly bestowed on it by the terms of said Act. Numerous grounds of alleged invalidity of the Act have been presented in extended oral argument and in the written briefs of counsel who have appeared on behalf of those whose interests are involved. A substantial number of the asserted grounds of invalidity raise questions of substance involving fundamental concepts of constitutional law affecting the basic foundations of our system of government.

There exists a state of emergency in that the public embraced within the district is presently required to pay a tax, with reference to which little or no practicable means are available to secure a refund if it be determined that the imposition thereof cannot lawfully be made. For this reason we resolve the issue of validity of the statute solely upon the single proposition hereinafter discussed. By so doing we do not pass upon any of the numerous arguments which have been made on other points. Although a general knowledge of the provisions of the act of the legislature is essential to a thorough understanding of our conclusion, we incorporate herein only those sections which bear directly upon the issue on which the controversy is decided.

The Act of the legislature involved will be referred to as the "statute." Section 1 consists of a declaration by the General Assembly relating to the purposes to be served and the objectives to be achieved under the statute. We quote the section in full:

"Legislative declaration. — The general assembly hereby finds, determines and declares that local governmental units within the metropolitan areas of this state have common problems and needs which transcend

the boundaries of such local governmental units; that as metropolitan areas become urbanized the need for capital improvements increases at an accelerated rate; that modern means of communication and transportation and the attendant mobility of population have transformed metropolitan areas into homogeneous areas in which ease of movement is an absolute necessity and in which capital improvements must be geared to the needs of the entire area; that capital improvements in any part of a metropolitan area inure to the benefit of the entire area, as well as to the people of the state; and that there is need for coordination of overall planning, financing and construction of capital improvements and for the acquisition of capital equipment in order to enable local governmental units to cope with the problems of urbanization and to provide benefits to the entire metropolitan area.

"It is also found, determined and declared to be in the interest of the people of the state to enable towns, cities, counties and cities and counties in metropolitan areas to acquire capital equipment which will enhance their ability to provide emergency services for the benefit of the entire metropolitan area and to enable them to meet the problems arising in the event of disaster in any part of such area.

"It is therefore declared to be the purpose of this act to provide a method through which the capital improvement and equipment needs of a metropolitan area may be determined, coordinated and resolved through an overall approach, and to provide the means by which the planning, acquisition, construction and financing thereof may be accomplished. To these ends the provisions of this act shall be liberally construed."

■ We readily agree that problems in urban areas exist and we observe that they always have and will continue to exist; that "financing and construction of capital improvements" and the acquisition of "capital equipment in order to enable local government units to

cope with the problems of urbanization" raise problems for which solutions are desirable. We have no hesitancy, however, in asserting that any act of the legislature which is adopted as a means to bring about a solution of these local problems must not involve the exercise of legislative power which the people, by constitutional provision, have very clearly stated the General Assembly shall not have.

█ Constitutional limitations upon the exercise of power cannot be swept aside or ignored to aid in the solution of problems in a manner pleasing to those officials who have the burden of finding solutions. Ours is a government by law, not a government by men. That which cannot be done because of constitutional limitations upon the power of officeholders, simply cannot be done, either directly or indirectly, notwithstanding that desirable, social or economic ends might be achieved by ignoring the limitations, and despite the unquestioned good intentions of those seeking to exercise the powers thus forbidden.

The statute in question purports to authorize the formation of Metropolitan Capital Improvement Districts. It is quite evident that the only area in which such a district would be formed is the Denver urban area, and that the City and County of Denver and all three surrounding counties must be incorporated within the district. The statute provides that an election shall be held throughout the proposed district (following preliminary organization proceedings which are not in any way material to the issues in this case). We take notice of the fact that in the instant case an election was held to determine whether a district as authorized by the statute should be formed, and that each of the counties surrounding Denver rejected the proposed district. A sufficient number of voters in Denver to overcome the adverse vote in the adjoining counties approved the district and thus the Four-County Metropolitan Capital Improvement District was created and a Board of Directors se-

lected as provided by the statute. Perhaps the most significant power of the district to be exercised by its directors, as provided by the statute, was as follows:

"Section 14. — Power to Levy Tax — exemptions. (1) To provide revenue to finance the operations of the district and to defray the cost of construction of capital improvements and acquisition of capital equipment, the board of directors, for and on behalf of the district, shall have power to levy and provide for the collection of a sales and use tax at the rate of two per cent upon every transaction or other incident with respect to which a sales and use tax is now levied by the state pursuant to the provisions of article 6 of chapter 138, Colorado Revised Statutes 1953, as amended; provided, however, that no such tax shall be levied and collected upon: * * *"

(Then follows a list of items exempted from the tax.)

Among other powers conferred upon the district, to be exercised by its Board of Directors who are selected from the several counties and municipalities as provided by the statute, we find the following:

"Section 13 — (5) To acquire and dispose of real and personal property, in accordance with the declared purposes of the district; including, without limitation, rights and interest in property, leases and easements necessary to the construction of capital improvements and acquisition of capital equipment, provided, that the district shall not construct any capital improvement or acquire any item of capital equipment, other than for the administrative needs of the district, unless the same has been requested by one or more local units [counties or municipalities within the district] as hereinafter provided, nor unless such request has been approved by the board of directors; and provided further, that the district in the exercise of its powers and authority and in the performance of its functions shall be subject to the planning, zoning, sanitation and building laws, or ordinances and regulations, applicable to the locality in which such

powers and authority are exercised and such functions are performed.

"(6) To have management, supervision and control of the construction of capital improvements and acquisition and installation of capital equipment requested by local units and undertaking in accordance with the terms of this act.

"(7) To employ and retain such employees, agents, engineers and attorneys as may be necessary to carry out the functions of the district, and to determine and fix the compensation thereof.

"(8) To have and exercise the power of eminent domain, both within and without the boundaries of the district."

Section 15 contains, inter alia, the following:

"Allocation of collections to local units. The board of directors of the district shall establish a fund for each local unit within the district to which shall be credited that part of the total proceeds of the revenue from any district sales and use tax which is available for construction of capital improvements or acquisition of capital equipment requested by such local unit, which shall be determined by the board as follows:

"(1) All net revenue derived from district sales and use taxes collected within a county or city and county, less an amount not to exceed one-half of one per cent thereof for necessary district administrative expenses, and less such amount as is necessary for costs of collection of the tax, shall be available for capital improvements or capital equipment requested by local units within or partly within the boundaries of such county or city and county."

Section 19, in pertinent part reads as follows:

"Title vests in local units — joint project requests. Upon completion or acquisition of any project or item by the district, the capital improvement or equipment shall be conveyed to the local unit or units at the request of which such project or item was constructed or ac-

quired, and such local unit or units shall accept the title thereto and shall thereafter maintain and operate the same. * * *"

 It is indisputably clear that the district is a conduit through which to channel taxes earmarked for local "capital improvement" or "capital equipment" in the county or city areas where collected. It is also clear that this "conduit" district after exercising the powers of "management, supervision, and control of the construction of capital improvements and acquisition and installation of capital equipment requested by local units" must forthwith thereafter convey the completed "capital improvement" or the "capital equipment" to the county or the city which made the request for its construction or purchase, and which supplied the money to pay for it. Indisputably the district becomes a conduit, created by statute, through which activity is channelled to accomplish objectives which for generations have been achieved by local officers directly responsible to the people, and upon whom the duty of discharging such local responsibilities has heretofore been placed by constitutional provision or municipal home rule charter provision, or both.

We now direct attention to pertinent provisions of Article XX of the Constitution of Colorado which severally, and in their cumulative effect, prohibit the far-flung activities proposed under the "Four-County" authority. The people of Colorado by Section 1, Article XX enumerated broad powers which they conferred upon the City and County of Denver. Included therein we find that the City and County of Denver:

"* * * shall have the power, within or without its territorial limits, to construct, condemn and purchase, purchase, acquire, lease, add to, maintain, conduct and operate, waterworks, light plants, power plants, transportation systems, heating plants, and any other public utilities or works or ways local in use and extent, in whole or in part, and everything required therefor, for the use

of said city and county and the inhabitants thereof, and any such systems, plants or works or ways, or any contracts in relation or connection with either, that may exist and which said city and county may desire to purchase, in whole or in part, the same or any part thereof may be purchased by said city and county which may enforce such purchase by proceedings at law as in taking land for public use by right of eminent domain * * *."

Thus *the people* by constitutional provision gave to *the City and County of Denver* full and adequate power to do everything necessary or essential to provide "capital improvements" for its inhabitants. By another portion of section 1, the people authorized the City and County of Denver to acquire all needed personal property or "capital equipment."

To remove all doubt concerning the nature of the powers granted to the City and County of Denver, the people amended the original Article XX and provided that home rule cities "are hereby vested with, and they shall always have, power to make, amend, add to or replace the charter of said city or town, which shall be its organic law and extend to *all its local and municipal matters*." (Emphasis supplied.) Section 6 continues as follows:

"Such charter and the ordinances made pursuant thereto in such matters shall supersede within the territorial limits and other jurisdiction of said city or town any law of the state in conflict therewith.

* * *

"It is the intention of this article to grant and confirm to the people of all municipalities coming within its provisions the full right of self-government in both local and municipal matters and the enumeration herein of certain powers shall not be construed to deny such cities and towns, and to the people thereof, any right or power essential or proper to the full exercise of such right.

"The statutes of the state of Colorado, so far as applicable, shall continue to apply to such cities and towns,

except in so far as superseded by the charters of such cities and towns or by ordinance passed pursuant to such charters."

■ In numerous opinions handed down by this court extending over a period of fifty years, it has been made perfectly clear that when the people adopted Article XX they conferred *every power* theretofore possessed by the legislature to authorize municipalities to function in local and municipal affairs. As stated by Mr. Justice Burke in *Denver v. Henry,* 95. Colo. 582, 38 P. (2d) 895:

"* * * What power is granted by it [Article XX] has however been fairly well settled by our decisions. It is 'Every power possessed by the legislature in the making of a charter for Denver.' *Denver v. Hallett,* 34 Colo. 393, 83 Pac. 1066. It is determined 'by ascertaining whether the legislature in the absence of article XX could have conferred upon the municipality the power in question.' *Londoner v. Denver,* 52 Colo. 15, 119 Pac. 156; *Denver v. Mountain States T. & T. Co.,* 67 Colo. 225, 184 Pac. 604."

■ After the adoption of Article XX all the home rule cities within the "Four-County District" (and there are several) had *all the power* that could be acquired by anyone to govern with relation to their local and municipal affairs. Only by constitutional amendment could this allocation of power be changed. In the area of providing local "capital improvements" and "capital equipment" in the cities, the General Assembly had nothing to give in the way of power or authority to any new superstructure of government encompassing multiple counties and numerous towns and cities. By the Home Rule Amendment the General Assembly had been deprived of *all* the power it might otherwise have had to legislate concerning matters of local and municipal concern. Particularly is this true where a home rule city has adopted a charter or ordinances governing such matters. A few of the authorities which might be cited supporting this statement are *Denver v. Hallett,* 34 Colo. 393, 83 Pac. 1066; *Londoner v. Denver,* 52 Colo. 15, 119

Pac. 156; *People v. Cassiday,* 50 Colo. 503, 117 Pac. 357; *City of Pueblo v. Kurtz,* 66 Colo. 447, 182 Pac. 884; *Denver v. Sweet,* 138 Colo. 41, 329 P. (2d) 441; *Davis et al. v. Denver,* 140 Colo. 30, 342 P. (2d) 674.

■ When the people by constitutional provision have lodged exclusive power in a political subdivision of government such as a home rule city, that power may be exercised only by the entity to which it was granted, and the home rule city cannot delegate the power elsewhere. Neither can the General Assembly re-invest itself with any portion of the authority it lost to home rule cities upon the adoption of Article XX by the people. Only direct action of the people can restore to the General Assembly any portion of the exclusive right of home rule cities to govern themselves in matters of local and municipal concern.

■ We are not impressed with the "window dressing" with which the statute is heavily weighted, the manifest purpose of which is to give the statute an outward appearance clearly contrary to its true character. The district contemplated by the statute has no specific identifiable "district purpose" except to collect sales taxes at a specified rate; to impound the moneys thus raised and allocate the same to the geographical "unit" from which collected; to spend the money in constructing the projects and furnishing the equipment which the "local unit" deems advisable in connection with its local needs; and thereafter to deliver over title to that local unit.

The City and County of Denver has long since recognized that it alone has the power to function in the field of capital improvements within its boundaries. By specific charter provision it has accepted this exclusive grant of power from the people of Colorado. The charter provision (which fully covers the field contemplated by the statute) reads as follows, (Article 2, Section A 2.3 and A 2.3-1):

"The following duties and powers are hereby vested exclusively in the Department of Public Works:

"Management and control of the designing, planning, construction and reconstruction of all general public improvements, including such remodelling thereof as requires designing or structural change, for the City and County and for all departments, agencies, boards, commissions and authorities thereof except the Board of Water Commissioners."

■ Article XX above quoted, and the said charter provisions adopted pursuant thereto, precludes any state law purporting to superimpose the functioning of a "Four-County District" Board of Directors on the activities of the City and County of Denver in supplying their "local and municipal" needs for "capital improvements" and "capital equipment." There can be no doubt that the activities contemplated by the district board of directors involve "local and municipal matters."

■ The plans for the City and County of Denver alone (to be carried out by the district) are widely advertised and are well known to all who can hear or read. That which is of common knowledge to an interested public can be judicially noticed. The master "capital improvement" plan for the immediate future within the City and County of Denver, as widely publicized throughout the area, includes expenditures for additions to the city's maintenance and equipment fleet, branch libraries, widening and surfacing of boulevards and streets, parks, swimming pools, boating facilities, a fire station, etc. Similar plans are proposed for other areas of the district. Thus it is apparent that the statute purports to empower the "Four-County District" to discharge the official functions of home rule cities with relation to local and municipal affairs. The constitution forbids such action.

■ Had the General Assembly itself undertaken to create by statute a super-municipal body politic, superimposed over the City and County of Denver and surrounding cities and counties, there can be little doubt that such enactment would clash headon with the pro-

visions of Article XX of the constitution and be stillborn in the face of that fundamental ordinance. We have held that the General Assembly may not lawfully delegate its authority to enact laws. See *Olinger v. People,* 140 Colo. 397, 344 P. (2d) 689. It follows that it may not confer upon others power it does not have.

The impact of the statute upon the City and County of Denver, and all the home rule cities included within the area, is such that the affairs of such cities cannot be severed from the operation of the statute even though it might be upheld against numerous other challenges to its validity. The test of severability is stated by this court in *Denver v. Lynch,* 92 Colo. 102, 18 P. (2d) 907, as follows:

"An act or a statute may be constitutional in one part and unconstitutional in another, and, if severable, the invalid may be stricken and the valid left stand. 6 R.C.L., p. 121, §121. The power of the court to make such a decision rests primarily upon legislative intent. * * * If the invalid portion of an act was apparently an inducement to the passage of the valid, the statute is not severable. Id. p. 125, §123. Nor can an essential part of an act, which colors the whole, be stricken as invalid and the remainder sustained. Id. p. 127 §125."

For the reasons above set forth we hold the statute in question to be unconstitutional, and direct that collection of the tax levied thereunder, and all other acts of the said Four-County District, terminate forthwith.

MR. JUSTICE SUTTON specially concurs.

MR. JUSTICE MCWILLIAMS dissents.

MR. JUSTICE PRINGLE not participating.

MR. JUSTICE SUTTON specially concurring:

I concur in the majority opinion written by Mr. Justice Moore. I am cognizant of the legislative purpose of this statute as a major effort to solve pressing problems of

Denver which are of metropolitan scope. Obviously those facing a metropolitan area such as Denver and its surrounding counties require joint planning, joint effort and mutual consideration and respect to arrive at proper solutions.

It is our duty, however, to declare statutes which conflict with the constitution invalid when properly challenged. When this occurs and the problems which led to the passage of the questioned legislation still exist those affected must seek other lawful methods of solution. One of these might be a proper constitutional amendment to authorize this new type of municipal corporation.

In addition to the reasons given in the majority opinion for invalidity of this statute I believe that it also violates Section 35, Article V, of the Colorado Constitution which reads:

"The general assembly shall not delegate to any special commission, private corporation or association, any power to make, supervise or interfere with any municipal improvement, money, property or. effects, whether held in trust or otherwise, or to levy taxes or perform any municipal function whatever."

The statute here in question purports to create a "special commission" authorized to "supervise or interfere with any municipal improvement" with relation to matters which are "local and municipal" in nature and in addition levies a tax therefor, all in violation of the express prohibition contained in the constitutional provision above quoted.

There is a vast difference between the type of all enveloping district attempted to be set up here to perform local duties already delegated elsewhere by our constitution, and the accepted concept of improvement districts, water districts, sanitation districts and the like which we have long recognized as proper. See for example: *People ex rel v. Letford*, 102 Colo. 284, 79 P. (2d) 274 (1938); *Milheim v. Moffat Tunnel District*, 72 Colo.

268, 211 Pac. 649 (1922); and *Aurora v. Aurora Sanitation District,* 112 Colo. 406, 149 P. (2d) 662 (1944).

MR. JUSTICE MCWILLIAMS dissenting:

The majority of this Court hold that Chapter 179 of the Session Laws of 1961 is unconstitutional solely on the ground that it is repugnant to Article XX of the Constitution of Colorado. I must respectfully dissent from this conclusion and shall briefly state my reasons therefor.

It is hornbook law that the solemn acts of our General Assembly should not be struck down by the judiciary as unconstitutional unless it clearly appears that the particular act is prohibited by a specific provision in our Colorado Constitution. Furthermore, when an act of the General Assembly is subjected to the charge of unconstitutionality, such act is aided in its struggle for existence by a presumption of constitutionality, which presumption prevails unless the contrary is shown beyond a reasonable doubt. See *Chicago, Burlington & Quincy Railroad Company v. School District No. 1,* 63 Colo. 159, 165 Pac. 260; *People ex rel. Attorney General v. Barksdale,* 104 Colo. 1, 87 P. (2d) 755. And in *Police Protective Association of Colorado v. Warren,* 101 Colo. 586, 76 P. (2d) 94, it was stated: "It is well to remember that our Constitution was not made nor adopted for any particular age or time. It was intended to serve so long as our form of government shall endure. Our purpose is not to search for reasons why a law should be held unconstitutional, but rather to accept it as constitutional, unless its repugnancy to the fundamental law clearly appears."

The question to be resolved is: May the General Assembly create or permit the creation of an independent governmental entity of a quasi-municipal character which is organized for a limited purpose to operate within the geographical confines of a municipality or

home rule city, and to include said municipality or home rule city within its geographical boundaries? This question must be answered in the affirmative. In support of my conclusion, see *Milheim v. Moffat Tunnel Dist.* 72 Colo. 268, 211 Pac. 649; *People ex rel. Setters v. Lee,* 72 Colo. 598, 213 Pac. 583; *People ex rel. Rogers v. Letford,* 102 Colo. 284, 79 P. (2d) 274; *People ex rel. Stokes v. Newton,* 106 Colo. 61, 101 P. (2d) 21; *Aurora v. Aurora Sanitation District,* 112 Colo. 406, 149 P. (2d) 662; *Anderson v. Town of Westminster,* 125 Colo. 408, 244 P. (2d) 371. Also see *Wilson v. Board of Trustees of Sanitary District of Chicago,* 133 Ill. 443, 27 N.E. 203, cited with approval in the *Milheim* case; and *Miami County v. City of Dayton, Ohio,* 92 Ohio St. 215, 110 N.E. 726, cited with approval in the *Lee* case.

In my opinion the *Milheim* case has particular applicability to the present controversy. There the General Assembly created an independent governmental entity of a quasi-municipal nature for the purpose of building a capital improvement, and said independent governmental entity proceeded to include the City and County of Denver within its geographical boundaries. This independent governmental entity then levied a tax on all property owners within its district, including the property owners in Denver, and built a capital improvement. In the instant case we also have an independent governmental agency of a quasi-municipal character which proposes to levy a sales tax and to construct capital improvements within its geographical boundaries. True, in the *Milheim* case the district was organized to construct only one capital improvement, but such is certainly not a controlling fact. Surely it would appear to be highly illogical to hold that an independent governmental agency which constructs one capital improvement is constitutional, but if it proposes to build more than one capital improvement, it is thereby rendered unconstitutional.

The concept of a metropolitan area is of recent origin,

at least in Colorado. But that metropolitan areas do exist is a fact, and not a figment of imagination. Metropolitan areas because they are metropolitan areas create metropolitan problems which suggest, at least, metropolitan action looking toward their solution. Against this backdrop the General Assembly enacted into law that which is now referred to as Chapter 179 of its Session Laws for 1961, wherein it was declared, inter alia, " * * * that capital improvements in any part of a metropolitan area inure to the benefit of the entire area * * *." And the gist of the testimony of the witness Bowes offered in connection with the formation of this district was that all property within the M.C.I.D. would benefit from any capital improvement within the metropolitan area. On this type of testimony, along with the other matters of an evidentiary nature which were before it, the district court of Arapahoe County brought M.C.I.D. into being. In this connection it seems to me that the majority of this Court seek to go behind this legislative and judicial finding and to substitute therefor their view that capital improvements in a metropolitan area do not inure to the benefit of all property owners within the metropolitan area, but that capital improvements even in a metropolitan area still remain a matter of purely local municipal concern. This, in my opinion, is outside the orbit of our judicial review. But if the concept of metropolitan capital improvements is to be tested, it requires no great amount of argument to convince me that the widening of South University Boulevard, for example, is of greater benefit to residents of Arapahoe County than it is to the residents of Northwest Denver. Modern metropolitan areas are simply no respecters of historical boundary lines.

In short, Article XX in my opinion does not clearly and beyond all reasonable doubt preclude the People through their General Assembly from trying to solve a specific metropolitan problem on a metropolitan basis,

and such being the case we should not by judicial fiat thwart their efforts in this direction.

Nor do I agree with Mr. Justice Sutton, who in a specially concurring opinion holds that Chapter 179 of the Session Laws of 1961 violates Section 35, Article V of the Colorado Constitution, which prohibits, inter alia, the General Assembly from delegating to any "special commission, private corporation or association any power to make * * * any municipal improvement * * * or to levy taxes * * *." Any contention that M.C.I.D. is a "special commission" within the meaning of the constitutional provision is specifically negated by *Aurora v. Aurora Sanitation District; Milheim v. Moffat Tunnel District; People v. Lee, People ex rel. v. Letford,* supra.

Mr. Justice Sutton also states in his concurring opinion that there is a "vast difference" between M.C.I.D. and "the accepted concept of improvement districts, water districts, sanitation districts, and the like * * *." I am unable to perceive this "vast difference." In fact I note a striking similarity as to their purpose and their basic method of creation and operation.

ON PETITION FOR REHEARING.

MR. JUSTICE MOORE:

In resolving the question of whether the Four-County Metropolitan Improvement District Act is constitutional, it was necessary in the public interest that a prompt announcement of the court's decision be made. In view of the content of the petition for rehearing, wherein it is asserted that we have overlooked or misapprehended certain matters, we have determined to add to our original opinion that which follows, from which it will appear that we have neither "overlooked" nor "misapprehended" the authorities on which the sponsors of the district rely.

Throughout the briefs of counsel for the district and in the petition for rehearing it was contended that the

law as applied in *Milheim v. Moffat Tunnel District*, 72 Colo. 268, 211 Pac. 649; *People v. Lee, et al.*, 72 Colo. 598, 213 Pac. 583 (the Pueblo Flood Dist. case); *People ex rel. v. Letford*, 102 Colo. 284, 79 P. (2d) 274 (a water conservancy district case); and *City of Aurora v. Aurora District*, 112 Colo. 406, 149 P. (2d) 662 (a case involving a sanitation district in a non-home rule city); *People ex rel. Stokes v. Newton, et al.*, 106 Colo. 61, 101 P. (2d) 21; and *Anderson v. Town of Westminster, et al.*, 125 Colo. 408, 244 P. (2d) 371, should be applied to the case at bar.

It is said that the facts involved in those cases, and the statutes there under consideration, are comparable to the situation disclosed by the record in the instant case. We are fully satisfied that this contention cannot be justified, once the statute involved and the authority proposed thereunder is fully understood. We have no hesitancy in asserting that a careful comparison of the proposed four-county district with any district involved in the cases mentioned, or any other district authorized by law at any time in the judicial history of Colorado, will disclose that the only similarity discernible is that the source of the authority granted is an act of the legislature and that they are designated as a "district" for the creation of some type of "improvement."

Before directing attention to a few most significant differences between the proposed district and those involved in the above mentioned cases, we agree that the law was correctly applied in each of said cases. We assert, however, that no multiple county district, embracing numerous home rule cities, can be empowered by action of the General Assembly to function in such cities in matters of local and municipal concern so long as Article XX remains a part of the constitution of Colorado. Any who seek to persuade this court to emasculate this constitutional provision by judicial fiat, are doomed to disappointment. To nullify constitutional safeguards for the sake of expediency in solving local problems of

Home Rule Cities generally and of the City and County of Denver in particular, would establish a precedent contrary to all precepts of constitutional government and initiate a process under which all constitutional safeguards would ultimately perish.

The very essence of a "Home Rule City" is embodied in the constitutional mandate that in its local and municipal affairs the city has full, complete and exclusive authority. The legislature is powerless to change this essential concept of home rule.

In matters which are not local and municipal and are particular projects which cannot be handled by the immediate area in which the physical installation is located (as in the case of the Moffat Tunnel), or where water conservation will benefit a large area as in the *Letford* case and the Pueblo flood district case, or where co-operative effort between areas extending beyond municipal or county lines is essential with reference to a particular project in sanitation affecting the public health of the entire area, an "improvement district" is perfectly proper. Under such projects, benefits are unquestionably conferred upon a wide area and property within the area so benefited *contributes proportionately to the cost of the improvement* by virtue of a mill levy upon the *taxable property* within the district, or by special assessment upon the real property the value of which is increased by the improvement. So far as the pronouncements of this court are concerned our recognition has never been given to any departure from the basic concept that an "improvement district" is geared to enhance the value of property; that such districts are financed by ad valorem taxes, or special assessments upon property; that the directors of such districts function as administrators of funds derived from taxes on real property the value of which has been enhanced by the "improvement."

The Four-County district here involved abandons com-

pletely all of these basic concepts. The tax base is completely divorced from any property sought to be "improved." A sales tax of 2% is imposed throughout the district. Thus at the very outset we have a significant departure from any district heretofore declared legal by this court.

Another glaring lack of similarity as between the present district and those, the validity of which was questioned, in the cases above mentioned, is that the proposed Four-County district wears an unprecedented suit of financial clothing, which completely repudiates the idea that the hundreds of varied improvements contemplated by the numerous local units which make up the district, would be conceived and constructed or purchased to effect a bona fide district-wide benefit resulting from such improvements. The districts which have been upheld in the past have had but one pocketbook, out of which are paid all expenses incurred by the board of directors in creating the improvements authorized and which beneficially affect the entire district to this one fund all taxpayers in the district contribute. The board of directors of such district has complete charge of the improvement before, during and after the construction. Such board does not need a "request" from any precinct, or city, or town, or county within the district before it can function. Nothing of the kind is necessary to give the district authority to function in promoting district-wide benefits. The "financial clothing" of the Four-County district, to which we have referred, has numerous separate pockets in it and anything that goes into one pocket must remain there to be expended *only* in supplying some *local* need requested by the particular *local* unit (such as a home rule city) which collected the particular fund from its own citizens. It is then carried down to the Four-County board and dropped into its own private earmarked pocket to be used only by that unit for some local requested improve-

ment to be created within its own geographical boundaries. If no request is made by the particular unit, which has deposited the money in one of the many pockets for a local improvement to be paid for out of the contents of that pocket, the board of directors has no power to create another or different improvement of any kind with the money thus frozen, no matter how urgent the need for a capital improvement might be elsewhere and which might be of benefit on a district-wide basis. This situation, undisputed on the admitted facts, certainly is not comparable to the methods of operation of any improvement district heretofore approved by this court. This multi-pocketed financial cloak and the lack of substantial control over district affairs by the governing board, is persuasive proof that the claim of a district-wide purpose to benefit the entire district by capital improvements and purchase of capital equipment, is a garment by which it is sought to avoid, if possible, the clear-cut provision of the constitution. If there is to be mutuality of benefit accruing throughout the district by the acquisition of improvements or equipment, all who enjoy the benefits should share in the cost thereof. There should not be twenty-five or thirty pockets in the financial cloak of the district containing money "earmarked" for certain units, placed there by those units, to be used only upon request of those units, if this creation is intended to be a bona fide attempt to create a district for the purpose of bestowing district-wide benefits, as distinguished from those projects which are, by their very nature, "local and municipal" in character. Under Article XX of the constitution such local needs must be provided by Home Rule Cities.

Proponents of the district urge that the widening of certain streets in the city of Denver would confer benefits on residents of counties within the district. This may be true but when considered in the light of the whole picture it falls far short of carrying legal significance.

Such street improvements have always been a local and municipal chore. The construction, maintenance, surfacing and general care of streets within home rule cities have always been local and municipal matters. Only in the case of Arterial State and Federal Aid highways passing through a city is any exception made. The proposed widening or reconditioning of any street in Denver would be planned, requested and paid for exclusively by that city out of the pocket earmarked "Denver." The suggestion would carry more conviction if the contemplated widening of a Denver street were an independent district project, planned by the district board, mutually contributed to by all in the district who receive a benefit therefrom. But where, as here, the local and municipal character of the improvement is carefully preserved, its inherent nature remains unchanged even though residents of adjoining counties have occasion to make use of the facility.

Another significant difference, standing out in bold relief, between the district now before us and any district considered in any of the decided cases, is the fact that after purchase of a piece of capital equipment or on completion of any capital improvement the district must forthwith convey it to the local unit which requested it, and which actually paid for it out of the pocket of the financial trousers of the district which was earmarked for that unit. In all other improvement, conservancy, or sanitary districts heretofore established, the improvements created (which in genuine substance serve the needs of the whole district) continue to be the property of the district which levied the tax to build them, and the administration, maintenance and operation thereof remains under the control of the board of directors of the district. This procedure is entirely consistent with the principle that bona fide district-wide benefits, and district acquired assets should be administered by officials of the district. In the Four-County district struc-

ture an entirely different situation is contemplated. The prime object to be served by the district here is to supply local needs. After completion of the improvement or after the purchase of capital equipment, the asset must be forthwith transferred to the ownership of the local "unit" requesting it, and the asset is no longer subject to any administrative direction by the officers of the district. Thus there is no assurance whatever that even the hollow shell of "district-wide benefit" would be continued after completion of the project and it is returned to the local unit where in substance it has always been. Can such an admitted purpose lead to a conclusion other than that the envisaged program involves the attempted solution of "local and municipal" problems? In this particular again we can find no similarity to the operations of any district which has heretofore been given legal recognition.

In yet another particular there is a marked lack of similarity in the matter of qualifications that must be met to become a member of the board of directors of the district. Generally, in order to qualify for membership on such a board, any resident in any area within the district is eligible. He is usually not required to reside in any particular precinct or town within the area. Not so in the instant case. Protection of the paramount local and municipal interests of the home rule City and County of Denver, which were primarily to be served by the district, was assured in the matter of representation on the board; and the "local" interests of other geographical units within the district were likewise protected by the manner in which the district board of directors was to be named.

Still another very patent difference appears from the fact that the statute purports to authorize the acquisition by the district of *personal property,* to be immediately turned over to a local unit to be used (in the case of home rule cities) in discharging their local and munici-

pal functions. This method of handling such matters is expressly forbidden by Article XX.

The specifications to which I have directed attention are only part of a chain of circumstances, the cumulative effect of which leads to the inescapable conclusion that the district was spawned for the primary purpose of supplying facilities and equipment which have always been considered and defined as *local* to areas which might have need for such facilities and equipment.

It is perfectly apparent that the major purpose for which the district was formed was to force the enactment of a 2% sales tax through the Four-County area, even though such tax might not be wanted or needed in areas outside Denver. Reduced to its essence, the creation of the district was nothing more than a smoke screen under which it was sought to get around the provisions of the constitution which command that with reference to local and municipal functions, a home rule city must be exactly that.

Historically, home rule cities, in numerous controversies before this court, have consistently insisted that in the handling of their local and municipal affairs they had exclusive control under Article XX. The position taken by the district in the instant case cannot be reconciled with the previous advocacy of such cities in numerous cases. We would be most unrealistic if we failed to recognize that in the instant case the voice of the district is in actual fact the voice of Denver.

Home rule cities should pursue their rights and duties and exercise exclusive control over their municipal affairs pursuant to Article XX of the constitution, or they should recognize the fact, if such it be, that economic changes and evolutions brought on by the passage of time and expansion of population have made that concept of home rule obsolete, and take proper legal action to gain redress. If in fact the home rule provision of the constitution is obsolete the remedy is to bring

about its repeal or amendment. It would indeed be a "black day" for Denver as well as for the entire state of Colorado if this court were to presume to amend or repeal this provision of the constitution by judicial fiat. Only by the vote of all the people of the State of Colorado may such result be accomplished, and their votes must first be recorded and the majority thereof one way or another determine the result. Under the separation of powers of government, a basic cornerstone in our way of life, it is not the function of the judiciary to destroy constitutional provisions by judicial decision. This is true even though the constitutional provision in question may in fact be a "horse and buggy device" as referred to by those whose plans are thwarted thereby.

The petition for rehearing is denied.

MR. CHIEF JUSTICE DAY, MR. JUSTICE SUTTON, MR. JUSTICE HALL and MR. JUSTICE FRANTZ concur in the foregoing.

MR. JUSTICE McWILLIAMS dissents.

MR. JUSTICE PRINGLE does not participate.