No. 23334.
No. 23337.

CHARLES GINSBERG, INDIVIDUALLY AND AS A TAXPAYING ELECTOR IN THE CITY AND COUNTY OF DENVER, STATE OF COLORADO, AND CHARLES D. BYRNE, AS AUDITOR OF THE CITY AND COUNTY OF DENVER, STATE OF COLORADO v. THE CITY AND COUNTY OF DENVER, A MUNICIPAL CORPORATION ORGANIZED AND EXISTING UNDER THE CONSTITUTION AND LAWS OF THE STATE OF COLORADO; THE BOARD OF COUNCILMEN OF THE CITY AND COUNTY OF DENVER, SOMETIMES ALSO KNOWN AS THE CITY COUNCIL OF THE CITY AND COUNTY OF DENVER, IRVING HOOK, PAUL HENTZELL, JOHN KELLY, KENNETH MACINTOSH, ELVIN CALDWELL, ROBERT KEATING, ERNEST MARRANZINO, EDWARD BURKE, JR., AND CARL N. DETEMPLE, AS MEMBERS OF THE SAID CITY COUNCIL (BOARD OF COUNCILMEN) OF THE CITY AND COUNTY OF DENVER; METRO STADIUM, INC., A COLORADO CORPORATION, ROBERT S. SESSERMAN, LARRY LEE VARNELL, ROBERT A. LAUTERBACH, MAX P. FREEMAN, AND ROBERT A. WHERRY, AS OFFICERS AND DIRECTORS OF THE SAID METRO STADIUM, INC. AND EMPIRE SPORTS, INC., A CORPORATION.

(436 P.2d 685)

Decided January 24, 1968.

CHARLES GINSBERG, GEORGE LOUIS CREAMER, for plaintiff in error Charles Ginsberg.

ROBERT S. WHAM, for plaintiff in error Charles D. Byrne.

MAX P. ZALL, City Attorney, BRIAN H. GORAL, Assistant, WINNER, BERGE, MARTIN & CAMFIELD, HUGHES & DORSEY, RAYMOND B. DANKS, RICHARD S. KITCHEN, SR., for defendants in error.

*En Banc.*

MR. CHIEF JUSTICE MOORE delivered the opinion of the Court.

PLAINTIFF in error, hereinafter referred to as Ginsberg, brought an action against the City and County of Denver a home rule city, the members of its city council, Byrne its city auditor, Empire Sports a corporation, and Metro Stadium Inc. a nonprofit corporation and its officers and directors. These defendants will be referred to as the City, the council, Byrne, Empire, and Metro as the occasion may require.

In his complaint Ginsberg challenged the legality, on the grounds hereinafter discussed, of a proposed transaction for the acquisition of a stadium by the City, and the issuance of its net revenue bonds with which to finance the enlargement and improvement of the stadium facility.

Byrne, as auditor, joined in most of Ginsberg's assertions of illegality, and alleged others. The City and all other defendants answered denying that the proposed transaction was in any manner unlawful, and affirmatively pleaded that it was in all respects legal. The prayer of these defendants was that Byrne be ordered to sign the proposed memorandum of agreement covering the transaction, and to sign the net revenue bonds to be issued by the City pursuant to that agreement.

The issues were fully tried and at the conclusion thereof the trial court found all the issues of fact and

law against Ginsberg and Byrne, and in favor of the City and all other defendants. Byrne, as auditor, was ordered to sign the memorandum of agreement and the net revenue bonds to be issued by the City as provided in the agreement. Motions for a new trial filed by Ginsberg and Byrne were denied.

The record before us, without substantial dispute at any point, establishes the following factual situation: Empire is the owner of the existing stadium facility which is involved. It is also the owner of two professional sports teams and the league franchises covering them, namely, the American League football team known as the "Broncos," and the Pacific Coast League baseball team known as the "Bears." The stadium is known as "Bears Stadium."

Metro is a corporation organized not for profit under Colorado law. It is engaged in raising funds by solicitation of donations from citizens on behalf of a public entity, in this case the City, with which to purchase Bears Stadium from Empire. Metro has been successful in raising sufficient cash and pledges to complete a transfer of the title to Bears Stadium to the City, free and clear of all liens or encumbrances.

The City, by various ordinances adopted by the council, which are now in force, approved the solicitation of funds on its behalf by Metro and agreed to accept those funds and to use same for the purpose of paying to Empire the agreed purchase price for Bears Stadium. Empire agreed to accept as full purchase price of Bears Stadium the moneys provided by Metro through its campaign for donations up to but not in excess of the sum of $1,800,000. The City additionally agreed to issue its "net revenue bonds" in the amount of three million dollars with which to enlarge and improve the stadium thus acquired. An ordinance, covering the net revenue bonds, passed by the council clearly provided that the principal and interest were payable solely out of the net revenue produced by the stadium after the payment

of all maintenance and operating expenses connected therewith. The ordinance further sets forth the form of the bond to be issued and it clearly states that the City cannot in any event be held liable or in any manner whatever be obligated, or called upon, to pay the principal or interest on the bonds. The principal and interest are payable solely from net revenue derived from operation of Bears Stadium. There is no lien, or pledge of any kind, placed on the stadium property as security for the payment of any sum due or to become due on the bonds. The record shows that the value of the stadium as presently existing is approximately $1,700,000 and when enlarged and improved will represent a facility, owned by the city, of a value of approximately five million dollars without one cent of cost to the City or its taxpayers, and without any possibility of the City or any of its taxpayers ever being called upon to pay anything for retirement of the bonds, or for operation and maintenance of the facility.

User agreements with Empire as operators of the Broncos and Bears were agreed to under which Empire guaranteed payment of all principal and interest on the bonds, and further agreed to pay rent which, together with all concessions and parking income, will provide the city with sufficient funds to cover all operating and maintenance costs. The City is not obligated to maintain or operate the facility except to the extent of funds which are derived from users, including Empire. The franchise owned by Empire as a member of the football league in which it participates is pledged as security for payment of the bonds. This football franchise has a value in excess of the total face value of the bonds to be issued.

Ginsberg and Byrne contend the transaction hereinabove summarized is illegal for the following reasons:

1. The acquisition of the stadium by the City is not a "public purpose."

2. The bonds under the bond ordinance are not to be

submitted to a vote of the taxpaying electors of the City as allegedly required by provisions of the charter of Denver.

3. That the user agreements with Empire are the grant of franchises by the City which under its charter require the approval of its taxpaying electors.

4. The acquisition of the stadium by Denver is the acquisition of a "utility" which requires the approving vote of the electors of the City.

5. That there is an illegal pledge of the credit of the city of Denver for the benefit of a private corporation, Empire Sports.

6. That in a prior election in which the question of the acquisition of a stadium, by a stadium district created by act of the state legislature and consisting of the City and County of Denver and parts of the counties of Adams, Arapahoe, and Jefferson and the issuance of general obligation bonds in the amount of $25 million to be paid by ad valorem taxes on the property within the district, was defeated and this precludes the presently contemplated transaction for various charter and constitutional reasons.

7. That there is in the user agreement an unlawful delegation of powers which can only be exercised by the City.

The trial court after hearing opening statements, testimony for more than three days, and arguments for almost two days, decided all the issues in favor of the City, the council, Empire and Metro, and against Ginsberg and Byrne. If there were any questions of fact there was ample evidence to support the trial court's judgment and we will not disturb it on review before this court.

## QUESTIONS TO BE DETERMINED

First. *Is the acquisition of a stadium in the manner described for a "public purpose?"*

We answer this question in the affirmative. The determination of what is a public purpose is pri-

580

marily for the legislative body, and if not clearly and palpably wrong the courts will not disturb the legislative determination. In *City and County of Denver v. Hallett,* 14 Colo. 393, 83 P. 1066, this court stated:

"* * * The test is whether the power, if exercised, will promote the general objects and purposes of the municipality, and of this the legislature is the judge in the first instance; and unless it clearly appears that some constitutional provision has been infringed, the law must be upheld."

In *Milheim v. Moffat Tunnel District,* 72 Colo. 268, 211 P. 649, this court quoted with approval the following language:

"But what is for the public good, and what are public purposes, and what does properly constitute a public burden, are questions which the legislature must decide upon its own judgment, and in respect to which it is vested with a large discretion which cannot be controlled by the courts, except perhaps where its action is clearly evasive, and where, under pretense of a lawful authority, it has assumed to exercise one that is unlawful."

The modern trend is to expand and liberally construe the term "public purpose." This is recognized in 2 E. McQuillin, Municipal Corporations, § 10.31 at 817 (3d ed. 1966) and C. Rhyne, Municipal Law, §§ 15-3, 15-4. See also 37 Am. Jur., Municipal Corporations, § 120.

The case of *Meyer v. City of Cleveland,* 35 Ohio App. 20, 171 N.E. 606, is persuasive. We set forth the following apt quotation from this case:

"Municipal corporations are not limited to providing for the material necessities of their citizens. * * * Generally speaking, anything calculated to promote the education, the recreation or the pleasure of the public is to be included within the legitimate domain of public purposes."

It is a matter of common knowledge that most large cities in this country have constructed or planned for

the construction of large sports stadiums. This court should not nullify the action of the City, which appears to be in tune with the trend of the times, if by reasonable interpretation of pertinent rules of law the action can be sustained. This is particularly true where, as here, such a facility can be acquired by the City as a gift involving the creation of no debt or expenditure of general revenue of the City.

■ In the case of *Martin v. The City of Philadelphia*, 420 Pa. 14, 215 A.2d 894, a case decided in 1966, the court stated: "A sports stadium is for the recreation of the public and hence is for a public purpose."

Second. *Is it essential to the validity of the proposed net revenue bonds that the question, as to whether they should be issued, should first be submitted to the "taxpaying electors" for approval?*

■■ This question is answered in the negative. Sections A6.17, A6.17-1, and A6.17-2 of the 1960 revision of the Denver charter were all contained in one section when originally adopted, namely, Section 250 entitled "Limitations of Bonded Indebtedness." It is clear from reading these sections that the situations covered involved "debt" and the creation thereof. The pertinent language of the charter in this connection is:

"* * * no loans shall be created nor bonds issued unless the question of creating the same *and issuing the bonds therefor* shall be submitted to," the taxpaying electors who shall vote in favor of * * * *"creating such debt and issuing such bonds. * * *"* (Emphasis added.)

In the proposal now under consideration no "debt" of the city is created, and it necessarily follows that there is no requirement that the issuance of the proposed net revenue bonds should first be approved by the "taxpaying electors." The ordinance providing for the issuance of the bonds, and the bond form itself, in unmistakable terms precludes the creation of a "debt" of the City. No taxpaying elector, whether a property taxpayer or one who pays any other kind of tax for the

support of city government, can ever be called upon to contribute any sum whatever for the maintenance of the stadium facility, or the retirement of the bonds. *Shields v. Loveland,* 74 Colo. 27, 218 P. 913.

The Denver charter provides that the annual budget shall include the "* * * amount to be raised *by taxation* to pay interest on *bonded indebtedness* and to provide for the sinking fund * * *." Section A6.11 of the charter provides that, "The amount required to pay the interest on the *bonded indebtedness* and provide for the sinking fund *shall* always be provided for out of the *tax on property.*" (Emphasis added.) It is for this reason that the charter provides that before taxes can be levied upon property for the purpose of paying the "bonded indebtedness" of the City, the property owners who will be called upon to pay are given an opportunity to veto the creation of the "bonded indebtedness" under consideration.

No justification whatever can be found for construing the charter provision in such a manner as to place a veto power in the hands of the "property taxpayers" to the exclusion of all other qualified electors, to negate the wishes of all the citizens, acting through their duly chosen representatives, where it is freely admitted that not one cent of tax revenue of any kind can ever be collected from any citizen for any purpose remotely connected with the stadium facility. The pertinent ordinance adopted by council with respect to the stadium proposal provides in substance as follows:

(1) Principal and interest are to be retired and paid solely from revenues derived from the facility after payment of all expenses of operation and maintenance.

(2) The general credit of the City and County of Denver is not pledged in payment of principal or interest thereon, the City specifically not being liable in any event of default.

(3) None of the tax revenues or other revenues of the City, except those derived from the facility after opera-

tion and maintenance expenses, are to be devoted to payment.

(4) No properties of the City, including the facility itself, are mortgaged, pledged or otherwise hypothecated as security for payment of principal or interest thereon. The receiver, if appointed, has authority solely to effectuate the pledge of revenue.

We have previously held under the special fund doctrine that net revenue bonds do not create a "debt" or indebtedness under Article XI, Section 8, of the Colorado constitution. *Perl-Mack Civic Association v. Board of Directors of The Baker Metropolitan and Sanitation District*, 140 Colo. 371, 344 P.2d 685. That the City and County of Denver has the power to issue net revenue bonds is clear from a review of the many cases decided by this court commencing with *People v. Sours*, 31 Colo. 369, 74 P. 167, to and including *Davis v. Pueblo*, 158 Colo. 319, 406 P.2d 671. The conclusion, that no election is necessary under the Denver charter provisions above referred to when net revenue bonds are issued and there is no pledge of any property, is clearly supported by *Davis v. Pueblo, supra,* where this court stated, *inter alia:*

"* * * The home-rule amendment specifically empowers a home-rule city to issue bonds. If there is no limitation on the bonds in question in the city charter, neither Article XI nor Article XX are violated. The only limitation imposed in the Pueblo city charter refers to general obligation bonds, and, as we have held, these are revenue bonds.

\* \* \*

"The bonds being revenue obligations required no election to be held at all. The submission to the voters was advisory only. The matter before the voters was not an ordinance which became effective after the vote. The City Council was not obligated to pass the ordinance. It could very well have enacted it without submission to popular vote. * * *"

There is nothing in the charter provision of the City which requires the application of a different rule than that announced by this court in the *Davis* case. On similar reasoning provisions of the ordinance for a court appointed and supervised receiver, after default, to effectuate the pledge of revenue, does not create a debt or otherwise invalidate the bond issue.

Third. *Do the user agreements entered into between the City and Empire amount to the grant of a "franchise" concerning which the approving vote of taxpaying electors is a prerequisite?*

This question is answered in the negative. The user arrangement is a mere lease or rental arrangement. Section C3.1 of the Denver charter concerns "franchise relating to any street, alley or public place" and is followed by Section C3.2 which requires that the franchise granted "shall plainly specify on what particular streets, alleys or avenues the same shall apply" clearly defining the meaning of what was intended. Certainly, "stadium" is not a street, alley or avenue any more than the auditorium, the arena, the coliseum or any other facility that the city from time to time leases to persons. We have defined a franchise in the recent case of *City of Englewood v. Mountain States Telephone and Telegraph Company*, 163 Colo. 400, 431 P.2d 40. The user agreements do not come within our definition.

Fourth. *Does the proposal under consideration amount to the acquisition of a "public utility" which cannot be accomplished without the approving vote of the electors of the City?*

This question is answered in the negative. The stadium is not a public "utility, work or way" as covered by Section C4.1 of the Denver charter or as referred to in Article XX, Section 1, of the constitution of Colorado. A public improvement or facility need not be a "public utility" covered by the above mentioned charter and constitutional provisions. In the case of *City of Englewood v. City and County of Denver*, 123

Colo. 290, 229 P.2d 667, we defined "public utilities" as being those facilities as are necessary for the maintenance of life and occupation of the residents, the services of which are available to all, and with respect to which all have the right to demand service.

In *Searle v. Haxtun*, 84 Colo. 494, 271 P. 629, we said: "* * * The term 'public utility' has come into use within the last thirty years in the sense, not of a chattel or other property used for the benefit of the public, but of a system of works operated for public use, examples of which are telephone, street railway, water, electric light and power, gas works and other systems. * * *"

Fifth. *Does the proposal under consideration amount to an illegal pledge of the credit of the City for the benefit of a private corporation?*

This question is answered in the negative. As previously stated, there is no pledge of the credit of Denver on the bonds and no debt of Denver is created. On the contrary, the bonds themselves clearly show that Denver shall in no event be looked to for payment or be liable therefor. The bond buyers in this case have specified that an independent firm should investigate and confirm the feasibility of the project. Thus from the terms of the ordinance, the bonds themselves and the purchase proposal, it is obvious that no reliance will be placed on the credit of the City.

Sixth. *Does the prior election, held pursuant to the act of the Colorado Legislature concerning a "Stadium District" and the proposed issuance of general obligation bonds in the amount of $25 million secured by lien on the property within the district, which was rejected by the voters, preclude the present proposal?*

This question is answered in the negative. The proposal here before the court is entirely different from the "Stadium District" proposal. The only similarity between the instant proposal and the one which was rejected by the property taxpaying voters is that a stadium is involved.

We see no reason to extend this opinion to answer in detail the contentions: (1) that the user agreements, under which Empire will make use of the stadium facility in connection with the operation of the Bears and the Broncos professional sports teams, amount to an unlawful delegation of powers which can only be exercised by the City; and (2) that the provision contained in the user agreement, under which a service charge would be made based on a percentage of the purchase price of admission tickets to the stadium, violates Article X, Section 3, of the Colorado constitution.

With reference to (1) above, it is sufficient to say that the user agreement here in question does not delegate powers to Empire, or to any other entity, in violation of law. The facts involved in the instant case are clearly distinguishable from those involved in *Four-County Metropolitan Capital Improvement District v. The Board of County Commissioners of Adams County,* 149 Colo. 284, 369 P.2d 67. The opinion in that case is not in any manner applicable to the case at bar.

With reference to the 5% or possible 10% service charge mentioned in (2) above, the matter seems to have been presented for the first time in this court. Even here, all that is said to support the argument in the 117 page typewritten brief of Ginsberg is based on the assertion that the service charge is a "tax." The complete argument, after quoting the constitutional provision that, "All taxes shall be uniform * * *" (Article X, Sec. 3), is as follows:

"It does not appear that the taxes, then, are to be levied willy-nilly by private treaty, in whatever manner may be agreed upon therein. If the device essayed is a tax, it is unconstitutional under this provision upon its face. If it is not a tax then it is difficult to see upon what basis it is levied at all."

The answer is a simple one. The "service charge" is not a tax. It is an additional percentage rental

which the City reserves the right to demand. It is not unlike a toll charge which is universally held not to be a tax. It is one of the conditions inseparably connected with the obligations of the parties under the lease agreements entered into between them. The City is given express power, by the terms of Article XX, Section 1, of the Colorado constitution to:

"* * * purchase, receive, hold and enjoy, or sell and dispose of, real and personal property; may receive bequests, gifts, and donations of all kinds of property * * *; and do all things and acts necessary to carry out the purposes of such gifts, bequests and donations, with power to manage, sell, lease or otherwise dispose of the same in accordance with the terms of the gift, bequest or trust, * * *."

Having the power to lease, the City has authority to agree by contract on the "service charges" to be collected from those who make use of the facility.

From all that has been stated above, it is clear that the reasonable conditions set forth in the user agreements, the objective of which is to accomplish the purposes intended by the overall transaction, are well within the powers conferred upon the City.

The judgment is affirmed.