PUEBLO AIRCRAFT SERVICE, INC., a Colorado Corporation, Plaintiff,

v.

The CITY OF PUEBLO, COLORADO, a Municipal corporation, Thomas Lopez, Individually and as Director of Aviation for the City of Pueblo, Pan–Ark Aviation, Inc., a Colorado Corporation, George Rabatin, Jr., Defendants.

Civ. A. No. 77–HC–1049.

United States District Court, D. Colorado.

Sept. 26, 1980.

Alan J. Sulzenfuss, Salida, Colo., and Maurice R. Franks, Pueblo, Colo., for plaintiffs.

David A. Cole, Asst. City Atty., and Thomas E. Jagger, Pueblo, Colo., for defendants, City of Pueblo and Thomas Lopez.

Kettelkamp & Vento, Pueblo, Colo., for defendants, Pan Ark Aviation, Inc., and George Rabatin, Jr.

## OPINION AND ORDER

CHILSON, District Judge.

### Preliminary Statement

This action arises out of the operation of a municipal airport by the City of Pueblo.

Since prior to the year 1970, various services, such as the refueling of aircraft, repair of aircraft, etc., were performed at the airport by three "fixed base operators" operating under leases from the City.

The three fixed base operators were the defendants, Pan Ark, Flower Aviation, and the plaintiff, Pueblo Aircraft Service, Inc.

In 1970, Willard J. Teel and Betty I. Teel acquired all of the stock of the plaintiff and thereafter managed and operated the business carried on under the lease to the plaintiff.

Plaintiff's lease expired by its terms on March 31, 1977, and was extended to June 31, 1977.

Several months prior to the expiration of plaintiff's lease, the City determined to require public bidding for a lease of the premises then leased to plaintiff. Plaintiff and Pan Ark were the only bidders. Pan Ark was declared to be the successful bidder and the City Council authorized the lease of said premises to Pan Ark on June 21, 1977, to commence on July 1, 1977.

Thereupon, plaintiff commenced this action seeking to recover damages based on certain claims under state law and other claims based on alleged violations of the Federal Antitrust laws.

The state claims were dismissed by the Court leaving for determination only the antitrust claims of the plaintiff and the defendants' claim that the City is immune from the Federal Antitrust laws.

Plaintiff's claims are designated in the pre–trial order as the plaintiff's First, Second, Fourth Claim (A), Fourth Claim (B), and Fifth Claim.

After the pre–trial order was entered, the claims against Flower Aviation were dismissed upon joint motion of Flower Aviation and the plaintiff.

Thereafter, the remaining defendants, City of Pueblo, Lopez, Pan Ark, and George Rabatin, Jr., filed motions for summary judgment of dismissal of the claims against them which motions are now before the Court for determination.

Briefs in support of and in opposition to the motions were filed supported by various affidavits, documents, and voluminous depositions. A hearing on the motions was had in open court on September 9, 1980.

The Court has read and considered the motions and the documentary evidence filed in support of and in opposition to the motions and has considered the oral argument of counsel.

By the pleadings and the summary judgment motions, defendants contend the City of Pueblo is immune from the Federal Antitrust laws. We address this question first.

### IMMUNITY

The pertinent uncontroverted facts are that the City in 1948 acquired from the Federal Government a tract of land which the Government had used as a military airfield during World War II. The City acquired the property for the specific purpose of establishing a municipal airport.

At the time of its acquisition, certain facilities for airport operations existed on the premises, including, among other things, hangars and a storage facility to store aviation fuel.

The deed from the Government to the City contained a provision that no exclusive right for the use of the airport shall be vested in any person to the exclusion of others in the same class including:

"Any exclusive right to engage in the sale or supplying of aircraft, aircraft accessories, equipment, or supplies (exclud-

ing the sale of gasoline and oil), or aircraft services necessary for the operation of aircraft (including the maintenance and repair of aircraft, aircraft engines, propellers, and appliances.)" (Affidavit of Fred E. Weisbrod, Exhibit No. 1)

In 1945, the State Legislature enacted a statute providing in pertinent part:

"Section 1. The acquisition of any lands for the purpose of establishing airports or other air navigation facilities; the acquisition of airport protection privileges; the acquisition, establishment, construction, enlargement, improvement, maintenance, equipment and operation of airports and other air navigation facilities, and the exercise of any other powers herein granted to any county, city and county, city or town, are hereby declared to be public, governmental functions, exercised for a public purpose, and matters of public necessity; and such lands and other property, easements and privileges acquired and used in the manner and for the purposes enumerated in this act shall and are hereby declared to be acquired and used for public purposes and as a matter of public necessity." (1945 Session Laws, P. 38.)

Prior to, and at all times since the acquisition of the airport, the City of Pueblo was a "Home Rule" City, chartered pursuant to Article XX, Section 6 of the Colorado Constitution, which provides in pertinent parts:

"Section 6. Home rule for cities and towns. The people of each city or town of this state, having a population of two thousand inhabitants as determined by the last preceding census taken under the authority of the United States, the state of Colorado or said city or town are hereby vested with and they shall always have power to make, amend, add to or replace the charter of said city or town, which shall be its organic law and extend to all its local and municipal matters. "Such charter and the ordinances made pursuant thereto in such matters shall supersede within the territorial limits and other jurisdiction of said city or town any law of the state in conflict therewith.

"It is the intention of this article to grant and confirm to the people of all municipalities coming within its provisions the full right of self–government in both local and municipal matters and the enumeration herein of certain powers shall not be construed to deny such cities and towns, and to the people thereof, any right or power essential or proper to the full exercise of such right.

"The statutes of the state of Colorado, so far as applicable, shall continue to apply to such cities and towns, except insofar as superseded by the charters of such cities and towns or by ordinance passed pursuant to such charters."

After acquisition of the airport, the City elected to provide certain necessary and essential services and supplies by leasing portions of the airport and the hangars and other improvements located thereon to fixed base operators who would provide those supplies and services to those using the airport. Specifically the leases provided:

"D. The City hereby grants unto the Lessee the following rights and privileges subject to the Rules and Regulations governing the Pueblo Memorial Airport set forth by the City, the State of Colorado, or the Federal Aviation Agency:

1. To sell new and used aircraft.

2. To conduct a school for the purpose of teaching others to fly.

3. To rent aircraft to others.

4. To charter aircraft.

5. To rent automobiles belonging to responsible automobile renting companies; i. e., Hertz, Avis, National.

6. To sell in the demised premises, soft drinks, candy and tobacco from coin operated vending machines but not food or food products.

7. To dispense aviation and automobile gasoline and lubricants or propellants in accordance to (sic) the rules and regulations of the City, and the Federal Aviation Agency, except that Lessee may not operate a public automotive service station nor dispense automobile gasoline, lubricants or propellants to the public. Said automotive operation is restricted to the Lessee's equipment and the servicing of rental autos.

8. To use, in common with others authorized to do so, common areas of the Airport, including runways, taxiways, aprons, and other conveniences provided for public use for the take–off, flying, and landing of aircraft.

9. In or upon said demised premises, to locate, maintain and operate shops for limited or full repair, maintenance and/or overhaul of aircraft, or aircraft components including the storage and sale of aircraft parts, accessories and airmen's supplies, materials and equipment.

10. To store aircraft for others, either in a main hangar, tee hangars or tie down area.

11. To manufacture aircraft or allied parts and components."

Leases were issued to three fixed base operators, namely the plaintiff, Pan Ark Aviation, and Flower Aviation. All three leases authorized the lessees to engage in all of the activities set forth above.

Since there was only one fuel storage facility to store fuel on the airport to supply the customers of the fixed base operators, each lease contained the following provision:

"The lessee agrees to purchase from the City all aviation gasoline or propellants dispensed through lessee's operation at the City's cost plus five cents per gallon."

This was modified in 1974 to increase the charge from five cents to five and one–half cents per gallon.

The City assumed the responsibility for providing and maintaining the storage facility, monitoring the quality of fuel, providing fire protection and delivering to and maintaining in the storage facility the fuel supplies to serve the needs of the fixed base operators and certain other aircraft using the airport who were not supplied by the fixed base operators.

Assuming but not deciding that the City's dealings with the fixed base operators violated the Federal Antitrust laws in one or more ways alleged in the complaint, we now address the legal question of the City's immunity from the Federal Antitrust laws in the light of the foregoing uncontroverted facts.

## CASE LAW ON IMMUNITY

The *Parker* Doctrine which is the basis for immunization of state action from the Federal Antitrust laws was established by the United States Supreme Court in *Parker v. Brown*, 317 U.S. 341, 63 S.Ct. 307, 87 L.Ed. 315 (1943). The doctrine has been the subject of interpretation in many later decisions of the federal courts, including the United States Supreme Court.

*California Retail Liquor Dealers Association v. Midcal Aluminum, Inc., et al.,* 445 U.S. 97, 100 S.Ct. 937, 63 L.Ed.2d 233 (1980) hereinafter referred to as *"Midcal"*, is the most recent decision of the Supreme Court dealing with the *Parker* Doctrine. In that decision, the Court set forth two requirements for state immunity;

1. That the state action be clearly articulated and affirmatively expressed as state policy; and,

2. That the policy be actively supervised by the state itself.

However, in *City of Lafayette v. Louisiana Power and Light Co.,* 435 U.S. 389, 98 S.Ct. 1123, 55 L.Ed.2d 364 (1978) the City was held not immune from an antitrust action arising from the operation of a municipally owned and operated electric power utility. In *Lafayette,* the plurality opinion recognized that in certain circumstances a municipality may be immune from antitrust violations. The opinion states:

"While a subordinate governmental unit's claim to Parker immunity is not as readily established as the same claim by a state government sued as such, we agree with the Court of Appeals that an adequate state mandate for anticompetitive activities of cities and other subordinate governmental units exists when it is found from the authority given a govern-

mental entity to operate in a particular area, that the legislature contemplated the kind of action complained of." *Lafayette* (supra) at page 415, 98 S.Ct. at page 1138.

The Tenth Circuit Court of Appeals in *Community Communications Company, Inc., v. City of Boulder,* 630 F.2d 704 (1980), held the City of Boulder (a Home Rule City) immune from the Federal Antitrust laws.

In that case, the plaintiff's complaint was directed to a city ordinance placing a moratorium on expansion of plaintiff's cable T.V. business and to the action of the city in soliciting others in the cable T.V. business to engage in that business in the City under a proposed model ordinance. Plaintiff claimed these actions were in violation of the Federal Antitrust laws.

In holding the city immune under the *Parker* Doctrine, the opinion reviewed both the *Lafayette* and *Midcal* cases.

The Tenth Circuit concluded the two tests set forth in *Midcal* had been met.

With reference to the *Lafayette* case, the Tenth Circuit opinion states:

"The decision, considering the several opinions, was grounded on the fact that the action was not directed or authorized by the state pursuant to state policy to displace competition with regulation or monopoly public service." (P. 708.)

The Tenth Circuit opinion cites the pertinent provisions of Article XX, Section 6 of the Colorado Constitution which we have set forth above and then states:

"The source of the authority of the City here is thus derived directly from the state constitution and is not a residual or delegated power. *See* the references in *City and County of Denver v. Henry,* [95 Colo. 582,] 38 P.2d 895, to the situations where an ordinance may even supersede a state statute as to matters of purely local concern. *See also Service Oil Co. v. Rhodus,* [179 Colo. 335,] 500 P.2d 807, and *Davis v. City and County of Denver,* [140 Colo. 30,] 342 P.2d 674. In any event, we are here concerned with City action in the absence of any regulation whatever by

the State of Colorado. Under these circumstances there is no interaction of state and local regulation. We have only the action or exercise of authority by the City.

"The Colorado Supreme Court has considered the scope of the Colorado version of home rule in several other cases including *Veterans of For. Wars, etc. v. Steamboat Springs*, 575 P.2d 835 (Colo.), *Security Life and Accident Co. v. Temple*, [177 Colo. 14,] 492 P.2d 63, and *Four–County Met. C.I. Dist. v. Board of County Com'rs.*, [149 Colo. 284,] 369 P.2d 67. In the *Four–County Metro* case the court stated that the home rule cities in Colorado as to local matters had the complete authority."

In other words, municipal policy exercised by a Home Rule City in Colorado is the equivalent of "state action" when exercised in connection with municipal affairs.

▆ In view of the fact that the state of Colorado has specifically authorized a city to acquire and operate a municipal airport and that such acquisition and operation "are hereby declared to be public, governmental functions, exercised for a public purpose and matters of public necessity, . . .", complete sovereignty has been granted by the Constitution to Home Rule Cities and the Court is satisfied that the City of Pueblo in its dealings with plaintiff and the other fixed base operators was acting in a governmental and not in a proprietary capacity.

The Pueblo Airport is located outside the territorial limits of the City of Pueblo. The plaintiff contends:

"Since the airport is outside the corporate limits, when Pueblo operates the airport it is not exercising home rule authority."

This contention is without merit.

In 1931, the legislature authorized cities "to acquire, establish, construct, own, control, lease, accept, improve, maintain, operate, and regulate airports and landing fields for the use of airplanes and other aircraft either within or without such municipalities . . . ." 1931 S.L. p. 788; C.R.S. 1973, § 41–4–201.

In 1945, the state legislature in authorizing municipal and county airports stated:

"All of the powers, rights and authority granted to counties by this act and to cities and towns by any other law may be exercised and enjoyed by such counties, cities and counties, cities and towns, acting jointly, either within or without the territorial limits thereof, without regard to the distance said airport may be located from the boundary of any such city or town." 1945 S.L. p. 39.

Article XX, Section 6 provides in pertinent part:

"The statutes of the state of Colorado, so far as applicable, shall continue to apply to such cities and towns, except insofar as superseded by the charters of such cities and towns or by ordinances passed pursuant to such charters."

Thereby the powers granted to a municipality which is chartered under the provisions of Article XX of the state constitution and not superseded by the charter of the Home Rule City are incorporated as a part of the powers which are granted by the constitution to a Home Rule City.

Pueblo's latest Charter adopted in 1954 provides in Section 1–3:

"By the name of Pueblo, the City shall have perpetual succession and shall have all the powers granted to municipal corporations and to cities by the Constitution and general laws of this State together with all the implied powers granted."

▆ The Court cannot concur with the conclusion of the plaintiff that the City of Pueblo in operating its airport outside the corporate limits of the City of Pueblo was not exercising Home Rule authority.

▆ We conclude that the City of Pueblo in its dealings with the fixed base operators is immune from the Federal Antitrust laws. Since all antitrust claims of the plaintiff against all the remaining defendants are based on alleged violations by the City of the Federal Antitrust laws, the immunity of the City requires the granting of the defendant's motions for summary judg-

ment of dismissal and the dismissal of this action with prejudice as to all defendants.

If the Court's ruling on the immunity question is correct, no further consideration of the summary judgment motions is necessary.

If, however, the Court's ruling on immunity should be reversed on appeal, the other questions raised by the motions for summary judgment will remain undetermined by the appellate court.

Therefore, the Court believes it highly desirable that it rule on all questions raised by the summary judgment motions in order that upon appeal, the appellate court can review the Court's ruling on all questions raised by the summary judgment motions if this Court's ruling on the question of immunity should not be affirmed.

By so doing, if this action is remanded for trial, the trial court and the parties can proceed with the trial in the light of the appellate court's affirmance or reversal of each of the trial court's rulings on each of the plaintiff's antitrust claims.

We therefore consider and determine the motions for summary judgment separately as to each of the plaintiff's antitrust claims.

## PLAINTIFF'S ANTITRUST CLAIMS

Rule 56(e) of the Federal Rules of Civil Procedure governs the Court's consideration of the motions for summary judgment.

It provides:

"Supporting and opposing affidavits shall be made on personal knowledge, shall set forth such facts as would be admissible in evidence, and shall show affirmatively that the affiant is competent to testify to the matters stated therein. Sworn or certified copies of all papers or parts thereof referred to in an affidavit shall be attached thereto or served therewith. The court may permit affidavits to be supplemented or opposed by depositions, answers to interrogatories, or further affidavits. When a motion for summary judgment is made and supported as provided in this rule, an adverse party may not rest upon the mere allegations or

denials of his pleading but his response, by affidavits or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial. If he does not so respond, summary judgment, if appropriate, shall be entered against him."

■ In considering the motions for summary judgment, the Court is well aware of the general rule established by the United States Supreme Court that "summary procedures should be used sparingly in complex antitrust litigation . . . ." *Poller v. Columbia Broadcasting System, Inc., et al.,* 368 U.S. 464, 473, 82 S.Ct. 486, 491, 7 L.Ed.2d 458 (1962).

We do not believe that this rule relieves the plaintiff of its obligation under Rule 56(e) to "set forth specific facts showing that there is a genuine issue for trial."

Nor do we believe that the Supreme Court rule relieves the trial court of its duty to review and consider the materials filed by the parties in support of and in opposition to the defendants' motions for summary judgment, to determine whether or not such material reveals specific facts showing that there is a genuine issue for trial.

The material submitted by the parties is quite voluminous, consisting of affidavits, six depositions containing over 650 pages of testimony, letters, proceedings of the City Council and other documents before the Court.

The Court has reviewed and considered this material as well as the briefs and the oral arguments of council and makes the following determinations.

## FIRST AND SECOND CLAIMS

These claims seek relief from the City and Lopez, the Director of the Airport.

The claims are based on the provision contained in the plaintiff's lease requiring the plaintiff to purchase from the City, at the City's cost plus five cents per gallon, all aviation gasoline or propellants dispensed by plaintiff through its operation.

There is no issue of material fact. Admittedly, the leases under which the plaintiff operated from 1970 to June 31, 1977, provided that the lessee was required to purchase all aviation gasoline or propellants from the City.

The reasons for the inclusion of this clause in the leases of the fixed base operators are not in dispute.

In 1948, the airport property was acquired from the Federal Government for the purpose of establishing and operating a public airport. The City then leased portions of the property to certain fixed base operators for the non–exclusive right to sell new and used aircraft; to conduct a school for the purpose of teaching flying; rental of aircraft to others; to charter aircraft; to dispense aviation and automobile gasoline and lubricants or propellants; to operate shops for repair, maintenance, and overhaul of aircraft; to store aircraft; and to manufacture aircraft or aircraft parts or components.

At the time the City acquired the airport, there existed an underground fuel storage facility which the City repaired, maintained and modified and continued to use as the airport's only fuel storage facility. It was located away from the terminal buildings and ramp area.

The City on a daily basis, monitored the fuel in order to control and assure its quality before it was dispensed by the fixed base operators.

The City purchased the fuel through competitive bidding. The supplier delivered the fuel to the storage facilities at the airport where it was dispensed to the customers of the fixed base operators and other users.

There is no evidence that the plaintiff or the other fixed base operators during the period of time here involved offered to build their own storage facilities at an appropriate place on the airport and thereby to obtain and store a supply of fuel from sources other than the City.

■ Upon the basis of these undisputed facts, the Court concludes that the exclusive dealing clauses in the plaintiff's leases did not violate either 15 U.S.C. § 14 or 15 U.S.C. § 1 and that the City's motion for summary judgment of dismissal of the first and second claims for relief should be granted.

With respect to the defendant, Lopez, it is undisputed that he did not assume the position of director of the airport until the year 1976 and the plaintiff has submitted no evidence, documentary or otherwise, that Lopez participated in any manner in the City's decision to include the exclusive dealing provisions in the plaintiff's lease or the leases of the other fixed base operators.

■ The plaintiff's lease was entered into in 1967 and plaintiff acquired it in 1970. The lease was extended in 1972 for an additional five years under an option contained in the original lease.

Assuming that the exclusive dealing clause was violative of the antitrust laws or any portion thereof, there is no factual or legal basis upon which Lopez could or can be held personally liable therefor.

The Court concludes that the motion of Lopez for summary judgment of dismissal of the plaintiff's first and second claims should be granted.

### FOURTH CLAIMS A AND B

The Fourth Claim A of the original complaint states in pertinent parts:

"Between January of 1974 and June of 1977, the following major services were available to aircraft customers at the Pueblo Memorial Airport on the competing basis: Plaintiffs and Flower Aviation, Inc., competed in fueling and lubrication; Plaintiffs and Pan Ark Aviation, Inc., competed in the maintenance and repair of aircraft and Plaintiffs and Pan Ark Aviation, Inc., competed in giving student flying instructions.

"That on or about January of 1974, the Defendants and each of them, did conspire with each other, to eliminate Plaintiffs as a competitor in the foregoing major services provided at the Pueblo Memorial Airport.

"That the Defendants did take the following overt actions in furtherance of the conspiracy referred to above:

"a. In February of 1974 The CITY OF PUEBLO refused to deliver Plaintiffs' aviation fuel which Plaintiffs by Lease was (sic) prohibited from purchasing from another party but nevertheless delivered to FLOWER AVIATION, INC. all fuel which FLOWER AVIATION, INC. desired;

"b. In the latter part of 1974 The CITY OF PUEBLO constructed a new building for FLOWER AVIATION, INC. which it rented to FLOWER AVIATION, INC. at a rental far below the market value for said building and far below the cost of amortizing said building over any reasonable period.

"c. In 1976 aircraft hangars rented by Plaintiffs and FLOWER AVIATION, INC. were damaged by a windstorm. The CITY OF PUEBLO repaired the hangar rented by FLOWER AVIATION, INC. but has failed and refused to repair the hangar rented by the Plaintiffs.

"d. In April of 1977 plaintiffs' lease expired on the land it leased and from which it operated its business at the PUEBLO MEMORIAL AIRPORT. The CITY OF PUEBLO placed said Lease up for bids. The Leases of FLOWER AVIATION, INC., and PAN–ARK AVIATION, INC., being longer than Plaintiffs' Lease, had not expired at that time and were not due to expire for (10) years hence. The conditions of said bid were such that Defendant PAN–ARK AVIATION, INC. was able to outbid the Plaintiffs for the land formerly occupied by the Plaintiffs.

The Court refers to this claim as Fourth Claim A or the 1974 conspiracy.

By amendment to the complaint, the plaintiff alleges:

"That between October 1976 and January 1977, George Rabatin Jr., representing and acting on behalf of Pan–Ark Aviation Inc., and Thomas Lopez, representing and acting on behalf of the City of Pueblo, did meet together and did conspire to place the premises occupied by Plaintiffs at Pueblo Memorial Airport up for bid and to impose such conditions upon that bid that the Defendant, Pan–Ark Aviation Inc. would be successful in obtaining said bid for the following purposes: to eliminate Plaintiffs as a competitor at Pueblo Memorial Airport; to permit Pan–Ark Aviation Inc. to expand into the lease occupied by Plaintiffs; and to permit Pan–Ark Aviation Inc. to use Plaintiff's fuel allocation at Pueblo Memorial Airport."

For convenience, the Court refers to this claim as Fourth Claim B or the 1976 conspiracy.

## FOURTH CLAIM A

This claim seeks relief from all defendants.

■ The Court's review of the material submitted in support of and in opposition to the motions for summary judgment reveals no facts which directly or by inference support the plaintiff's allegation that the defendants entered into a conspiracy to eliminate plaintiff as a competitor in the major services provided at the airport by fixed base operators or support the allegation that the overt acts set forth in the complaint were done in pursuance of such a conspiracy.

The uncontroverted facts revealed by the material are as follows:

All three fixed base operators were authorized by their respective leases to engage in all of the same activities including fueling and lubrication, maintenance and repair of aircraft and giving student flying instructions.

Both Mr. and Mrs. Teel state in their depositions that they know of no agreement or other acts constituting the alleged 1974 conspiracy. (Willard Teel Deposition, pp. 148–151 and Betty Teel's Deposition, p. 31). As to the allegations of overt acts by the City as alleged in paragraphs 5(a), (b), and (c), the following uncontroverted facts ap-

pear from the materials filed in connection with the summary judgment motions.

As to the allegations in (a), in February 1974, the sale of aviation fuel was restricted by the Federal Government and the City received a limited allocation. The City in turn allocated available supplies to the fixed base operators on the basis of the amount of previous purchases. (Deposition of Mrs. Teel, p. 44.)

As to the allegations in (b), the materials reveal the original buildings occupied by Flower Aviation were old and in poor condition and the City desired to replace them. In 1974, Flower proposed to the City that it would build an addition to the existing terminal building to be used by Flower in place of the old buildings it occupied. This proposal was not completed because Flower could not finance the construction of the new building. The City then agreed to build the new building and lease it to Flower and the present buildings would be demolished by the City. (Weisbrod Deposition pp. 15–18). The new building was constructed and the City entered into a lease with Flower for twenty years with an option to renew the lease for an additional ten years at a rental which the City determined would recapture the cost of the new building.

With respect to paragraph (c), the uncontroverted evidence is that in 1976, considerable wind storm damage to the buildings occupied by the fixed base operators occurred. Flower's buildings were relatively new and were repaired. The buildings occupied by the plaintiff were so old and deteriorated that major repairs were not justified. Plaintiff in May 1974, in a letter to City Manager Weisbrod, stated "___ I would like to point out the hangar is probably beyond economical repair." (Exhibit 7 attached to City's motion for summary judgment.)

Upon the foregoing uncontroverted facts, and the failure of plaintiff to set forth any specific facts showing that there is a genuine issue for trial of its Fourth Claim A, the Court concludes the defendants' motion for summary judgment of dismissal of Fourth Claim A should be granted.

## FOURTH CLAIM B

The amendment to the complaint alleges that between October 1976 and January 1977, George Rabatin, Jr., acting on behalf of Pan Ark, and Lopez, acting on behalf of the City of Pueblo,

"did meet together and did conspire to place the premises occupied by plaintiff ___ up for bid and to impose such conditions upon that bid that defendants, Pan Ark ___ would be successful in obtaining said bid ___"

and thereby eliminate plaintiff as a competitor and permit Pan Ark to expand on to the lease occupied by plaintiffs and to use plaintiff's fuel allocation.

In order to accomplish the purposes alleged above, there must first have been a conspiracy between Pan Ark and the City, first to get the City to put the plaintiff's leased property up for public bid and secondly, to get the City to include in the bid the requirement that the successful bidder provide a new building to replace hangar No. 4.

The plaintiff has offered no specific facts to support these alleged conspiracies.

The uncontroverted facts before the Court are that on February 4, 1975, a year before Lopez became director of the airport, the Department of Transportation, through the Federal Aviation Agency, notified the City as a follow up to a compliance review pursuant to Title VI of the Civil Rights Act of 1964:

"Although the leases contain renewable provisions, I recommend that you continue to notify OMBE and the minority business community in Pueblo of opportunities available as airport concessionaires, and that bids be solicited from qualified minority firms and awards made without regard to race, color or national origin."

In 1976, Rabatin, Jr., became a stockholder and general manager of Pan Ark. Pan Ark's leasehold adjoined that of the plaintiff. Pan Ark decided that it needed additional hangar space. Rabatin, Jr., and

Charles Hedrick, stockholders of Pan Ark, talked to Lopez about their needs and their plans to provide an additional hangar on Pan Ark's then existing leasehold. Both Rabatin and Hedrick met with Lopez, discussed their plans, and asked that Pan Ark's leasehold be surveyed so they could plan for the construction of a new hangar on their leasehold. The survey was made and Rabatin, Jr., contacted some companies engaged in constructing hangars.

There is no evidence of any discussions between Lopez and Rabatin, Jr., about the subject of putting the plaintiff's leasehold up for bid when plaintiff's lease expired or what the terms of the bid proposal by the City would contain. On March 14, 1977, the City Council adopted Resolution No. 3932 stating that the City is committed to compliance with Title VI of the Civil Rights Act and stating:

> The leasing and/or granting of licenses to persons, firms or corporations for the use of available airport facilities be made by solicitation of bids including notification to the Colorado Economic Development Association, an affiliate office of the Office of Minority Business Enterprise, as well as the minority business community of Pueblo, and the award of such leases and/or licenses be granted without regard to race, color, religion, sex or national origin.

On April 5, 1977, at an informal meeting of the City Council which was attended by Mr. Teel representing the plaintiff and Mr. Rabatin, representing Pan Ark, Mr. Weisbrod, the City Manager

> "noted that Pueblo Aircraft Service lease is expiring and a 90–day extension was given so everyone can comply and it will be going for bids on May 15 for the granting of a new lease, or proposal for that fixed base operation."

The fixed base operation referred to was that being conducted by the plaintiff.

Also at this meeting, proposed minimum standard requirements for leases and concessions at the airport were discussed.

The City Manager, Mr. Weisbrod, said it would be in the best interest of the City to demolish hangar No. 4 located on plaintiff's leasehold.

On May 17, 1977, proposed minimum standards were discussed at a meeting of the City Council and later adopted. The minimum standards required lessees to lease or construct adequate buildings to carry on the activities of the lessee.

The minimum standards so adopted were furnished to prospective bidders together with the City's proposed "Operating Agreement and Land Lease." The "Proposed Operating Agreement and Land Lease" in Paragraph 2.32 provided:

> "The City of Pueblo will demolish the existing hangar located on Parcel 1 (Exhibit "A") within sixty days of the date hereof so that the Lessee may construct or lease a building of at least 11,000 square feet total useable space. An office, pilot's lounge, rest rooms, and student's class room will be required (approximately 3,000 square feet). A maintenance shop and aircraft hangar space should accommodate at least five aircraft. A minimum of 2400 square feet is required for a maintenance shop."

There were two bids submitted, one by the plaintiff, and one by Pan Ark. Plaintiff, in its bid, attached the following:

> "Pueblo Aircraft, Inc., must exclude the following paragraphs from the lease proposal for the following reasons:
>
> "Paragraph 2.32—Demolishing the existing hangar located on parcel one and requiring an 11,000 square foot building imposes an impossible financial requirement. Pueblo Aircraft Service, Inc., will make a determined effort to solve the building problem and erect an adequate facility as soon as possible."

Pan Ark's bid contained no such exclusions. Pan Ark's bid was accepted by the City as being the best and highest bid and the lease between the City and Pan Ark was executed.

The plaintiff has failed by affidavit or otherwise to offer any specific facts supporting its allegation that the actions of the City Council in placing plaintiff's leasehold

up for bid or including in the bid proposal that the successful bidder would be required to provide a new hangar on the leasehold and hangar No. 4 would be demolished by the City, were the result of a conspiracy between Lopez and Rabatin, Jr.

Having failed to set forth specific facts supporting the alleged conspiracy, the Court is of the opinion that defendants' motion for summary judgment of dismissal of the Fourth Claim B should be granted.

## FIFTH CLAIM

By this claim, the plaintiff alleges:

A. The City refused to renew plaintiff's lease.

B. The bid proposal required the successful bidder to construct a new hangar to replace hangar No. 4.

C. That because Pan Ark already had a building on its leasehold, it was able to outbid the plaintiff.

D. That the effect of Pan Ark's successful bid was to create a monopoly in Pan Ark, in the services of repair and maintenance of aircraft and student flying instruction and constituted a violation of 15 U.S.C. § 1.

The admitted facts are:

1. The plaintiff's lease by its terms expired on June 31, 1977.

2. The bid proposal required the successful bidder to construct a new hangar to replace hangar No. 4.

3. Pan Ark already had a building on its leasehold.

4. Pan Ark desired to have and made plans to provide additional hangar space on its present leasehold. Pan Ark bid on the plaintiff's former leasehold with the intent that if it was the successful bidder, it would erect the new hangar it desired on plaintiff's former leasehold.

5. That plaintiff refused to comply with that portion of the bid proposal which required that the City demolish the existing hangar No. 4 and that the successful bidder would provide a new building on the plaintiff's former leasehold.

6. After Pan Ark was awarded the lease on plaintiff's former leasehold, there remained two fixed base operators, Pan Ark and Flower Aviation, both of whom were authorized to engage in and compete for repair and maintenance of aircraft and the giving of student instruction.

7. The Pan Ark lease contains no provisions giving Pan Ark the exclusive right to engage in the repair and maintenance of aircraft and the giving of flying instruction.

8. The Pan Ark lease does not exclude any other person from applying for a lease on unleased land at the airport to engage in fixed base operations, including the furnishing of those services and nothing in the lease of the two remaining fixed base operators prevents the City from entertaining such a proposal and submitting it for public bid.

Upon these admitted facts, the Court concludes that the granting of the lease to Pan–Ark did not create a monopoly in the services of repair and maintenance of aircraft and student flying instruction in violation of 15 U.S.C. § 1.

The Court concludes that the defendants' motions for summary judgment of dismissal of the Fifth Claim should be granted.

## ORDER

IT IS THEREFORE ORDERED that the defendants' motions for summary judgment of dismissal are hereby granted and that final judgment of dismissal of this action and the complaints therein with prejudice shall forthwith enter as to all defendants and that final judgment in favor of the defendants and against the plaintiff for the defendants' costs to be taxed by the Clerk of the Court upon the filing of a bill of costs within ten days from this date, be forthwith entered.